UNITED STATES of America

v.

William CURTIS, III, Appellant.

No. 80–1868.

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1980.

Decided March 16, 1981.

As Amended March 25, 1981.

Burton A. Rose (Argued), Donald M. Moser, Peruto, Ryan & Vitullo, Philadelphia, Pa., for appellant.

Robert L. Hickok (Argued), Asst. U. S. Atty., Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Roberto Rivera-Soto, Asst. U. S. Attys., Philadelphia, Pa., for appellee.

Before GIBBONS and WEIS, Circuit Judges, and WHIPPLE *, District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

William Curtis, III appeals from a judgment of sentence following a jury verdict finding him guilty on three counts of illegally distributing methamphetamine, 21 U.S.C. § 841(a)(1) (1976), and one count of illegal possession of a firearm during the commission of a felony. 18 U.S.C. § 924(c)(2) (1976). We reverse and remand for a new trial.

I

Like most controlled substance cases that we see, the government's case consisted of the testimony of an informant, an undercover Drug Enforcement Administration Agent, and purchases made with government funds. Curtis stipulated that each of the drug transactions occurred, and that during the last one he was carrying a weapon. As a witness on his own behalf Curtis testified that the transactions were the re-

* Honorable Lawrence A. Whipple, United States District Judge for the District of New Jersey, sitting by designation.

sult of solicitations, demands, inducements and threats by the government, amounting to entrapment. For present purposes it suffices to say that determination of the entrapment question, the sole issue in the case, turned on whether the jury believed the informant and the undercover agent, or Curtis.

The government was informed in the defendant's opening statement that Curtis admitted the transactions and raised an entrapment defense. Before the end of the government's case, and thus well before Curtis testified, the court granted leave to call four defense witnesses out of turn. All four were character witnesses, and each was asked on direct examination what Curtis' reputation as a peaceful law abiding citizen was in the community of which the witness was a member. Each gave the expected answer that his reputation was "excellent" or "terrific." On direct examination none of the character witnesses was asked his own opinion of any facet of Curtis' character, and none volunteered any such opinion. The government's cross examination at that point in the trial gives rise to one of several issues raised on appeal.

The first character witness was Thomas McNulty, business manager of the Plumbers' Union local of which Curtis is a member. On cross examination he was asked:

Q. Mr. McNulty, do you know anything about methamphetamine?

A. No, sir.

\* \* \* \* \* \*

Q. Do you know that it is illegal?

A. Yes.

Q. What would you say if you were told that Mr. Curtis admits in this court of law that he did perform the acts that he was charged with but that he is saying that someone put the idea in his mind? What would you say to that?

A. I would be very, very surprised. This question could only refer to defense counsel's disclosure in his opening to the jury that the defense was relying on entrapment. It went beyond the scope of

direct examination, since it asked, rather inartfully, for the witness' opinion either on the merits of the defense, or, what was more likely intended, on the effect of the defense on defendant's character. No objection was made concerning the scope of cross examination. The question was, however, an incomplete and unfair characterization of the defense position, since it did not describe all the elements of the entrapment defense. Defense counsel attempted to bring the inquiry back within the scope of direct examination, and within the boundaries of the entrapment defense, asking:

Q. Is your surprise that he is involved in this activity?

A. Yes.

Q. OK, and if in fact people in the community told you that he was forced to do it, would that be consistent—

The Court: Wait a minute, wait a minute.

The question was cut short and disallowed. Defense counsel tried again:

Q. If, for example, people in the community had told you that he was involved in drugs per se, that would shock you; is that correct?

A. It certainly would.

Q. Now, if people in the community told you that he was involved in drugs because someone induced him to do it, would you then change your attitude?

An objection to the last question was sustained. Thus the net effect of the government's cross examination and the trial court's rulings on redirect, was that when a witness testified on direct examination concerning good reputation in the community, the government was permitted to ask how the witness' own opinion of defendant's character would be affected by an admission of participation in the charged transactions, while the defendant was precluded from testing that opinion by putting the entrapment elements into the hypothetical which was its basis.

The second character witness was Michael Clarke, a high school teacher. On cross examination he was asked:

Q. And is there a drug problem in your high school?

The question was objected to as outside the scope of direct, but the court permitted it because "It has to do with his opinion, what it is based upon." This ruling was incorrect, since Clarke had not testified as to his opinion. When he acknowledged his high school was probably like every other with respect to drugs, the cross examination continued:

Q. Is there a problem with methamphetamine?

A. Not as much as other drugs. All I hear is hearsay. I am not in the discipline.

Q. And as a teacher at that high school, I assume you are very much against drugs among your students?

A. Absolutely.

Q. And you are very much against the use of methamphetamine?

A. Absolutely.

Thus over objection, and in the guise of testing an opinion the witness never expressed, the government was permitted to elicit the information that in the high school in the community in which Curtis lived, there was a drug problem, and that the teacher witness was very much against drug use. It should be noted that he had not testified about Curtis' reputation in the High School community, but in the community at large. The cross examination continued:

Q. And you have already heard the questioning that I placed to the other witness, so I make the same question to you, Mr. Clark [sic]: Would it surprise you if you knew that this defendant has walked into this court and has essentially admitted that all the three sales occurred including a pound of methamphetamine? Would that change your testimony?

MR. MOSER: Your Honor, I would object and ask him not to answer the question. The issue here is not his opinion; the issue here is what he hears from people in the community. And if I had asked him what is his opinion of Mr. Curtis, the U.S. Attorney would object.

THE COURT: Well, the specific evidence of specific instances that are rele-

vant can be considered by a witness and he can—

MR. MOSER: Judge, most respectfully, he is only testifying as to what he is hearing in the community.

THE COURT: Yes.

MR. MOSER: As to my client.

THE COURT: Objection overruled.

MR. MOSER: All right.

THE COURT: The question is would you change your opinion if you learned that fact?

Thus faced with a specific and exact reference to the limited scope of direct examination, the court ruled, as with McNulty, that an opinion about Curtis' character could be elicited on the basis of an incomplete and incorrect characterization of defense counsel's opening statement. Moreover, in the quoted colloquy the Court made it clear that the specific post indictment conduct referred to in the government's question could be referred to. Counsel persisted:

MR. MOSER: Judge, I have to respectfully object. It is not his opinion that he changes; he is here to testify as to the opinion of people in the community.

THE COURT: Well, that's what I am saying. He is conveying that. He has testified what he has learned from members of the community. Based upon what he has heard he has—

MR. MOSER: Most respectfully, the question should be, with the people in the community, would they change their opinion, not his.

THE COURT: Objection overruled.

A. Could you please repeat the question?

BY MR. RIVERA-SOTO:

Q. O.K.. Would you change your opinion, the one that you just stated to this jury, if you knew that the defendant, William Curtis, III, walked into this courtroom and admitted selling three times methamphetamine up to the quantity of one pound of 80 percent pure plus unlawfully carrying a gun at the same time? Would that change your opinion?

A. Of Mr. Curtis?

Q. Yes, of Mr. Curtis.

A. No, I don't believe so.

The third character witness was Raymond Mitchell, administrator of the Plumbers' union local pension fund. After the usual answer, the government was permitted to ask, over objection, a series of questions about legal requirements for plumbers which would give them a fairly detailed knowledge of their legal obligations. The government then inquired whether Mitchell had asked people in the community about Curtis, and when he acknowledged having done so, asked:

Q. Now, in your opinion, if they talked about it and they had known defendant Curtis had said, "Yes, I did it, but I didn't have any predisposition to do it," if they knew that the defendant, Curtis, had said that, would that opinion change?

A. You asked me if their opinion would change?

Q. No, I am asking you if your opinion—

A. My opinion—

Q. —the one you gave to this jury—

A. I wouldn't believe that. I would have problems believing it.

MR. MOSER: Judge—

Don't answer the question, please.

—I am going to object again and if he is going to keep up, I must respectfully ask for a mistrial. It is an abuse of character testimony.

The transcript suggests that the witness' answer was blurted out simultaneously with the objection, but the court considered the objection.

THE COURT: Have any of those persons that you know heard about this case?

THE WITNESS: Yes, sir.

THE COURT: Had any of those persons you know heard of anything else that the prosecutor has just asked you to your knowledge?

THE WITNESS: Well, I don't know how much they heard, Your Honor.

THE COURT: All right. I will let the testimony stand the way it is. I will sustain the objection.

In view of this ambiguous ruling the prosecutor then inquired:

[Q] May I inquire, your Honor, as to the competence of that opinion which is really all I am getting at?

The Court responded:

Well, he said he heard, he perceived others say, that the defendant's reputation for being a law-abiding citizen, a peaceful citizen, was good, and he also said what he believes those persons heard in the community.

Although the witness understood the prosecutor's question to mean "He was asking me what I think" the Court ruled:

"He was telling [sic] you what other persons in the community if they had knowledge would think,"

and foreclosed further inquiry. The final character witness was cross examined only about his friendship with Curtis.

## II

Prior to the adoption of the Federal Rules of Evidence the rule concerning character evidence in the federal courts and most others was that the only relevant evidence was that of reputation in the community for the character trait in issue. Some commentators on the law of evidence suggested that opinion evidence by persons qualified to state an opinion should also be admissible. The Advisory Committee on the Proposed Federal Evidence Rules accepted the advice of the commentators, and Rule 405, as forwarded to Congress, permitted both reputation and opinion evidence. The proposal was controversial, and was initially rejected by the House Judiciary Committee. After debate, however, the Advisory Committee language was restored by floor amendment. *See* 2 Weinstein's Evidence 405–1—405–13 (1980). Rule 405(a) thus provides that proof of character "may be made by testimony as to reputation or by testimony in the form of an opinion." [1] The rule also provides that

---

1. Rule 405(b) also permits proof of character by specific instances of conduct, but only when

"character or trait of character of a person is an essential element of the charge, claim or

"[o]n cross-examination, inquiry is allowable into *relevant* specific instances of conduct." (emphasis supplied). The rule made no change in the long settled prohibition against the affirmative use by the government of evidence of bad character as proof of guilt. Thus *relevant* specific instances of conduct are only instances going to the accuracy of the character witnesses' testimony. *See United States v. Herman*, 589 F.2d 1191, 1197 (3d Cir. 1978) *cert. denied*, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979). If, as here, their direct testimony is addressed to community reputation, inquiry may be made about conduct, and even about charges, which may have come to the attention of the relevant community. *See Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). If, on the other hand, opinion evidence is offered in proof of character, relevant cross examination is only that which bears on the fact or factual basis for formation of the opinion.

An example will serve to illustrate the necessity for keeping separate the two different types of character evidence now permitted under Rule 405(a). The rule now allows testimony by expert witnesses on traits of character which may be substantively relevant. *See* 2 Weinstein's Evidence, 405–33—405–35. Let us suppose that in an entrapment case the defendant produced an examining psychiatrist's opinion evidence of unusual susceptibility to suggestion. It could hardly be contended that in cross-examination of such a witness it would be relevant to inquire into those factors bearing on his reputation in the

community among lay persons. Even when evidence of general good character as a law abiding citizen is offered, the analytical distinction between the two types of evidence remains. Under the rule, which changed the prior law, it is possible for a defendant, whose community reputation is bad, to produce opinion evidence based on personal observation and close association, that his character is good.

■ Moreover, an accused may advance more than one character trait as evidence, so long as each of those traits are germane to some issues in the trial. Obviously cross examination must be confined to matters bearing on the particular character trait to which the witness testified. Impeachment of a witness who testified as to reputation for non-violence, for instance, should not open the door to cross examination about specific instances of lying.[2] *Michelson v. United States*, 335 U.S. at 475–76, 69 S.Ct. at 218; *United States v. Lechoco*, 542 F.2d 84, 87–88 (D.C.Cir.1976).

■ In dealing with community reputation for a trait of character, moreover, it has long been settled that reputation reasonably contemporaneous with the acts charged is relevant, but that reputation after the criminal charge under consideration is not. *E. g., United States v. Candelaria-Gonzalez*, 547 F.2d 291, 294 n.5 (5th Cir. 1977); *United States v. Lewis*, 482 F.2d 632, 641–42 (D.C.Cir.1973); *Gross v. United States*, 394 F.2d 216, 219 (8th Cir. 1968). The reason for this limitation on relevancy is that the accused's reputation could well

defense." Rule 405(b) is relevant in this case only to the extent that by negative inference it precludes the government's affirmative use, for any purpose, of specific instances of conduct.

2. Judge Robinson's frequently cited summary of the proper approach to the limits of relevancy in cross examination of character witnesses helps clarify the issue:

The matters the witness is to be asked about should first be established to the trial judge's *satisfaction as actual events*. The questions put to the witness should be carefully and narrowly framed. The questions, of course, must be restricted to events affecting the

character trait or traits the accused has placed in issue; their propriety is to be determined "by comparison with the reputation asserted." The process demands close supervision; "[w]ide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse." And obedient to the principle governing any use of evidence indicative of other criminality, the inquiry should be permitted only when "the probative value of the information which might be elicited outweighs the prejudice to the defendant."

*United States v. Lewis*, 482 F.2d 632, 639 (D.C. Cir.1973). (citations omitted).

be affected by the gossip which accompanies an indictment, and thus might not be a fair reflection of his character. *See United States v. Lewis, supra.*

## III

■ Applying the foregoing rules to the record before us, we cannot accept the trial court's reasons for denying Curtis' post trial motion for a new trial. As the court explained its ruling:

> Curtis was denying he possessed the guilty mind to commit the acts, but he was admitting the occurrence of the very factual acts for which he was on trial. Placed in that unique posture, the Court finds that, in this case, the question was permissible and probative of the character traits of Curtis allegedly known to the community at the time of trial for which the character witnesses were being challenged.

There are several difficulties with this explanation. First, the quoted portion of the post trial memorandum confirms what the colloquy at the time of Clarke's testimony suggests, that the Court believed that reputation at the time of trial rather than at the time of commission of the alleged offense was the relevant factor. We have noted that the rule is otherwise.[3] Moreover, the court's summary is not a fair characterization of the examination which was permitted. McNulty was asked what *his* opinion was of a defendant who would admit to three sales of drugs. He never testified to community response to the prosecutor's hypothetical. Clarke, similarly, was asked *his* opinion. It was only in ruling on Mitchell's testimony that the court finally grasped the point defense counsel was pressing, that there was a difference between reputation and opinion testimony.

■ The only real issue in the case bearing on guilt or innocence was whether or not the defendant was entrapped or coerced by threats. Before he could assert entrapment the law required that he admit participation. See 1 Wharton's Criminal Law § 52 p. 267 & n.42 (collecting cases). There was no real dispute that government agents instigated the transactions using government funds. As in most entrapment cases, the only real question to be decided by the jury was Curtis' predisposition to commit the offense. On that question, his community reputation as a peaceful and law abiding citizen was more clearly relevant than most uses of character evidence. Improper impeaching cross examination should, in such circumstances, ordinarily be considered grounds for a new trial. In cases like this, if, for example, the prosecutor had made use of other crimes evidence not known to the community in which the defendant's reputation was established, or had attempted to elicit opinions from a reputation witness based on instances of other, and later wrongdoing, a reversal of the denial of a new trial motion would usually be required. *Cf. United States v. Herman, supra.*

■ For the future, we remind trial judges, prosecutors and defense attorneys that Evidence Rule 405(a) has not effected a merger between reputation and opinion evidence. The reference in the rule's second sentence to cross examination on "relevant specific instances of conduct" is to instances of conduct relevant to the type of testimony offered on direct examination. Thus an opinion witness can be cross examined only on matters bearing on his own opinion, while a reputation witness can only be examined on matters reasonably proximate to the time of the alleged offense and likely to have been known to the relevant community at that time. Moreover the cross examination must be confined to conduct relevant to the character trait to which the direct testimony was directed.

This case, however, is unique in that although the cross-examination was improper it put before the jury nothing bearing upon the defendant's character additional to the

---

**3.** The character trait to which the testimony was directed was that of being a peaceful, law abiding citizen. Whether, had the testimony been directed to his reputation for truthfulness, the relevant time frame would include post indictment incidents such as admissions is a question not here presented.

fact of participation, which he conceded. Moreover the prosecutor's effort to use that concession as a means for eliciting unfavorable opinion from reputation witnesses was largely unsuccessful. Thus we conclude that this is an instance of "error, defect, irregularity or variance which does not affect substantial rights." Fed.R.Crim.P. 52(a).

## IV

■ Curtis also contends that the court erred in permitting the prosecutor to cross examine upon and comment upon his post arrest silence. While he was on the stand the prosecutor asked

And then in this hour and a half or two hours, you never said to those police officers, "You got the wrong guy; I was forced into it"?

Defense counsel objected. At a side bar conference he explained that the defendant had no obligation to make a statement. The court observed:

The defendant has taken the stand. He has given up his right not to testify against himself.

Counsel explained that his objection was to affirmative use of post-arrest silence. The court then observed:

The only thing I want to know is this: In this entire interrogation between the time he was arrested until this very day, is there any evidence that he ever asserted his right under the Fifth Amendment?

The prosecutor replied that Curtis had not. Counsel urged that his post-arrest silence could not be used against him even if he had not mentioned the fifth amendment. The court nevertheless overruled the objection. At that point Curtis explained that he waited until he spoke to a lawyer, because he had never been in a situation like that before.

The court's ruling is inconsistent with *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) and *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). The question and answer were not stricken. Prior to closing argument, however, the court returned to the issue, stating:

THE COURT: Now, lastly, on the question posed to the defendant as to why he didn't tell the law-enforcement people that he was threatened, I have allowed the question, no problem. The defendant gave his response. His response, a fair meaning of it is that he found he was in a legal setting. He wanted to see a lawyer. He had a perfectly legal constitutional right to remain silent for that reason.

I don't want the prosecutor to argue to the jury, "Why didn't he tell them?" O.K.? Because you are in effect penalizing a party for exercising its constitutional right, not because he had a right not to say anything. As it is on the record now, no problem, it stands there. I will not strike it; it is proper.

But I don't want you to capitalize on the fact that he said nothing and I will tell the jury that a person arrested has no obligation to say anything and so forth. So avoid that in your argument. I don't think there is any legal basis for you to argue it on the facts of the case for the reason I gave. O.K.?

Despite this explicit direction to the prosecutor that he refrain from commenting on post arrest silence, in his closing argument counsel argued:

"Well, ladies and gentlemen of the jury, you remember the direct examination of William Curtis and you remember the cross-examination of William Curtis and there was just one question that was asked of Mr. Curtis.

And by that I ask the Court's leave to argue this, Your Honor.

And that is, why didn't you tell the story to anyone before?"

Defense counsel objected immediately, and the objection was sustained with a cautionary instruction. At the end of the prosecutor's closing argument counsel moved for a mistrial, which was denied. The matter was raised again on the motion for a new trial, which was denied.

In denying the motion for a new trial the court focused on the prosecutor's comment

"why didn't you tell the story to anyone before?" This quotation, the court held, was ambiguous, and could have been a reference to pre-arrest silence, permissible under *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). That is not a fair characterization of the prosecutor's argument however, for as the quoted portion makes plain, he referred to his cross-examination. The cross examination referred to was specifically directed to the period of an hour and a half after Curtis' arrest, and there is no cross-examination about pre-arrest silence or other non-custodial interrogation. In the context of this record there is nothing the least bit ambiguous about the reference.[4]

As another ground for denying the motion for a new trial, the Court reasoned that its prompt curative instruction effectively negated any prejudice resulting from the prosecutor's argument. In so concluding, however, the court reasoned that "the comments were brief, isolated in context and ambiguous." Brief they were, because defense counsel was alert. But they were neither isolated nor ambiguous. They were placed in context by the prosecutor's reference to his cross examination, and there was only one item of cross examination to which they could possibly relate. Moreover they referred to a portion of the cross examination on which the jury's attention had been focused with particularity by defense counsel's unsuccessful objection.[5]

The court should have sustained the objection to cross-examination on post-arrest silence, and the prosecutor should have obeyed the court's direction not to make reference to it. Taking the two incidents together, we simply cannot accept the court's conclusion that there was no violation of the *Hale-Doyle* prohibition. Nor can we conclude that in this instance the errors, cumulative in effect, were harmless.[6]

## V

The judgment appealed from will be reversed and the case remanded for a new trial.

WEIS, Circuit Judge, dissenting.

The majority reverses because the prosecutor commented to the jury about, and was permitted to question the defendant on, his failure to claim entrapment when he was in custody for about two hours after his arrest. I do not agree that these actions were impermissible under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), or *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).

In *Hale*, the Court ruled, as a matter of federal evidence, that postarrest silence is ambiguous. In exercising its supervisory function, the Court concluded that prejudice to the defendant outweighs the probative value of the evidence and requires its exclusion. The following term, in *Doyle*,

4. The dissent relies on *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) for the proposition that cross examination about a statement can include cross examination about omissions from the statement. That reliance is misplaced, for the district court made perfectly clear its understanding, which the record fully supports, that the cross examination was not directed to any prior statement, but solely to post-arrest silence. The dissent attempts to affirm a ruling which was not made on an issue which was not presented.

5. In *United States v. Anderson*, 498 F.2d 1038, 1044–45 (D.C.Cir.1974) *aff'd sub nom. United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) the D.C. Circuit held the judge's immediate instruction to the jury to disregard the prosecutor's reference to defendant's post-arrest silence was inadequate to cure

an error of constitutional dimensions. The court was not satisfied that the instruction rendered the error harmless beyond a reasonable doubt.

6. Institutional considerations also weigh heavily in favor of a new trial. We have had too many occasions to comment on the all too prevalent practice of unfair argument by government attorneys. When it is presented in the face of an express advance warning to avoid it, the dignity and integrity of the judicial process demands an effective remedy. None short of the grant of a new trial has to date provided effective deterrence against such misconduct. Thus even if we could agree that the conduct was not significantly prejudicial, which we cannot, a reversal still would be in order.

the Court held that cross-examination of the defendant about his failure to speak after being given *Miranda* warnings violates due process. The Court concluded that *Miranda* warnings create an implicit assurance that silence will not be invoked against the accused.[1]

Rather than being a *Hale* or *Doyle* situation, this case is controlled by *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). There, the Court held that when an accused does speak to the police following his arrest, "[a]s to the subject matter of his statements, the defendant has not remained silent at all." 447 U.S. at 408, 100 S.Ct. at 2182, citing *United States v. Agee*, 597 F.2d 350, 354–56 (3d Cir.) (in banc), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979).

In *Anderson*, the defendant was queried about inconsistent statements *and* his " 'failure to tell arresting officers the same story he told the jury.' " 447 U.S. at 408, 100 S.Ct. at 2182. Concluding that this line of cross-examination cannot be neatly bifurcated to permit the former but forbid the latter, the Court said:

> "Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case."

*Id.*

Unlike the defendants in *Hale* and *Doyle*, and like the defendant in *Anderson*, the accused here did not maintain silence about the facts of the crime. Thus, *Hale* and *Doyle* do not apply. *United States v. Agee, supra* at 354–57. On cross-examination, the defendant testified that after his arrest he talked with the officers while he was in the police car. He admitted telling them "there was going to be $1,000 made [on the transaction]."

Although it is possible to reconcile this statement with the defendant's testimony that he was going to give the $1,000 to the person who allegedly had threatened him, that argument would be for the jury. It is enough under *Anderson* that this version is arguably inconsistent with the defendant's statement at trial that he was forced into the drug transaction. Consequently, the cross-examination on the defendant's inconsistent statements and his failure to relate the entire story to the arresting officers was permissible,[2] and absent other circumstances, a proper subject for comment to the jury.[3]

I agree with my colleagues that the prosecutor should not have referred to this matter in the face of a direct order from the trial judge to avoid the subject. Such conduct by trial counsel cannot be condoned. Nevertheless, because the evidence was legally admissible, I do not believe that the grant of a new trial is an appropriate remedy. The conviction is supported by substantial evidence and should stand.

Although the majority and I agree that the cross-examination of the character witnesses does not warrant reversal, we approach our conclusions by a different route. The majority finds objectionable, but harmless, cross-examination of reputation witnesses on their own opinion of the accused. I would hold inquiry of this nature to be within the sound discretion of the trial judge. As we said in *Government of Virgin Islands v. Petersen*, 553 F.2d 324 (3d Cir. 1977), Federal Rule of Evidence 405, which

---

1. In the case at hand, the record does not show when, or if, *Miranda* warnings were given. The defendant does not claim error in this respect, so I shall assume they were properly given immediately after the arrest and before the defendant said anything. *Cf. Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (reference to prearrest silence permissible). Since he spoke freely with the police following his arrest, there is a strong argument that he did not rely on the *Miranda* warnings.

See *North Carolina v. Butler*, 441 U.S. 368, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979).

2. *See* The Supreme Court, 1979 Term, 94 Harv. L.Rev. 77, 77–87 (1980).

3. *Anderson v. Charles, supra*, was not decided until after the trial of this case, and consequently, the district judge did not have the benefit of that opinion.

allows cross-examination of witnesses on specific instances of conduct, "reflects the reality that reputation evidence has been largely opinion in disguise." *Id.* at 328. *See* Advisory Committee Notes, Fed.R.Evid. 405; D. Louisell & C. Mueller, Federal Evidence § 149 (1978 & Supp.1980).

A defendant who wishes to produce evidence of good character generally seeks persons of high standing in the community. Obviously, this is not because these people better survey community reaction, but rather because their appearance on the witness stand is an implicit personal endorsement of what the accused's "reputation" is said to be. Otherwise the most valuable person as a character witness would be a public opinion pollster. As it is, people who are popular figures in the area, hold high office, or are otherwise held in esteem are asked to appear. Recognition of this fact may also be found in the canon of judicial conduct that discourages judges from appearing voluntarily as character witnesses. *See* ABA Code of Judicial Conduct, Canon 2 B. It is likely, and intended, that a jury will infer from reputation testimony that the witness personally shares in the community's regard of the defendant.

It is this tacit, individual vouching that makes character witness testimony valuable to defendants, and probably is the reason for its survival, albeit under the guise of reputation evidence. Federal Rule of Evidence 405 simply recognizes a fact of litigation life in allowing a witness to express his opinion on character. Permitting cross-examination on the personal views of the witness strips away some of the fiction fostered by rigid, formalistic rules of evidence. Indeed, allowing individual attestation is not a new development in the law, but rather a return to ancient practice.

In evaluating the proper scope of cross-examination, much depends upon the discretion of the trial judge. As with all other cross-examination, the court must not lose sight of the possible prejudicial impact on the defendant of unfair questioning. In some circumstances, for example, hypothetical questions to a character witness can be improper. *See United States v. Morgan*, 554 F.2d 31, 33–34 (2d Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977).

In this case, cross-examination of the reputation witnesses about the defendant's admission of trafficking in drugs revealed nothing new to the jury and thus possessed no intrinsic prejudicial effect. Indeed, the questioning produced none of the detrimental effects associated with such facts as arrest and unrelated convictions that have been permitted in purported probing of the witness's knowledge about defendant's reputation. *See Michelson v. United States*, 335 U.S. 469, 479–83, 69 S.Ct. 213, 220–22, 93 L.Ed. 168 (1948). Moreover, I believe the cross-examination here furnished the jurors with information they could use to evaluate the worth of the character evidence. I therefore find no abuse of discretion.

Although it is true that generally the relevant reputation for being law-abiding is that existing contemporaneously with the commission of the criminal offense charged, *United States v. Lewis*, 482 F.2d 632, 641–44 (D.C.Cir.1973), the defense may nevertheless wish to establish repute as of a later time. Good community standing after charges have been publicized would be particularly helpful to the defendant. *See* 5 J. Wigmore, Evidence § 1618 (Chadbourn rev. 1974). If the defendant's credibility is an issue, reputation for veracity at the time of trial would be relevant.

In the case at hand, defense counsel asked each character witness, "What *is* [the defendant's] reputation" in the community for being peaceful and law-abiding? (Emphasis supplied.) No attempt was made to limit repute to the date of the offense or earlier in order to exclude such later events as knowledge of and publicity about the charges.

The prosecutor's questions about community reaction to the defendant's concession that he sold drugs, but had been entrapped, were therefore not beyond the scope of direct examination. Had direct been confined to some period before the trial, the

274

cross-examination might well have been improper, particularly if it were clear that the evidence solicited was not intended to impeach the defendant's credibility as a witness. *See United States v. Rispo*, 470 F.2d 1099, 1102 (3d Cir. 1973).

In *United States v. Null*, 415 F.2d 1178 (4th Cir. 1969), the court found no reversible error when the prosecutor questioned character witnesses on whether the charges affected the defendant's reputation. Recognizing that public discussion of pending accusations could adversely affect reputation, the court nevertheless found the cross-examination relevant because the defense had asked what the reputation *"is."* *Id.* at 1180. I also observe that counsel never voiced any objection on the ground that the character evidence was confined to the time the sales took place. Therefore, insofar as the time of reputation is implicated, the testimony was admissible.

I conclude that the cross-examination of the character witnesses and the defendant was not improper and, further that the prosecutor's comment to the jury does not warrant a new trial. Accordingly, I would affirm the judgment of the district court.