UNITED STATES of America,
Plaintiff-Appellee,

v.

Jose Armando OCHOA–SANCHEZ,
Defendant-Appellant.

No. 81–1381.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 2, 1982.

Decided May 10, 1982.

Mario Conte, Deputy Federal Public Defender, San Diego, Cal., for defendant-appellant.

Larry P. Zoglin, Asst. U. S. Atty., argued, M. James Lorenz, U. S. Atty.; Larry P. Zoglin, Asst. U. S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Before WRIGHT and FLETCHER, Circuit Judges, and MEREDITH,* Senior District Judge.

EUGENE A. WRIGHT, Circuit Judge:

Defendant was convicted of illegal importation and possession of a controlled substance with intent to distribute. At trial he denied any knowledge that the heroin was in the car. On appeal, he claims primarily that his due process rights were violated by the prosecutor's use of post-arrest silence to impeach his trial testimony. We affirm.

---

\* Of the Eastern District of Missouri.

1. The relevant portion of the transcript reads:
BY DEFENSE ATTORNEY:
Q. Now, how did it come about that you left Santa Ana and went down to Tijuana?
A. Jose [Angel Ortega] invited me.
   . . . .
Q. When did he invite you?
A. He saw me on the 14th, in the afternoon, and he went by in the morning. I was sleeping in the car, and he woke me up, and he said, "Let's go," . . . .
Q. Did he suggest to you where you would be going?
A. Just to go for a ride.
   . . . .

## I. Post-Arrest Silence

On December 15, 1980, defendant drove into the San Ysidro Port of Entry. Responding to the customs inspector's questions, he said he had visited Mexico for fun and had been there for two or three hours. He said that the car belonged to a friend.

The heroin was discovered following inspection in the secondary inspection area, to which the customs inspector had directed him. He was arrested and advised of his rights. Upon questioning by Drug Enforcement Administration special agent Murray, he claimed he knew nothing of the heroin. He told the agent that the car belonged to a white man, a "gabacho," that he had driven into Mexico that morning, and that his purpose was to visit a friend. Although he first claimed not to know the identity of the car's owner, he later explained that he borrowed the car from his friend, who was a friend of the owner.

Agent Murray's first question about the identity of the friend from whom defendant borrowed the car was unanswered. But defendant later identified the friend as Angel Ortega. Responding to questioning designed to discover where Ortega could be found, defendant told the agent that he lived in an apartment complex in Santa Ana. Although he asserted that he did not know the street address, he revealed the name of the street and the apartment number of Ortega's residence. He did not know the telephone number.

Defendant testified at trial.[1] Claiming that defendant's trial testimony was

Q. Now, did you go with Jose Ortega?
A. Yes.
Q. And was anybody with him?
A. Yes.
Q. Who?
A. Daniel Santillon.
Q. What kind of car were they in?
A. In a blue station wagon.
Q. Where did you go?
A. To Tijuana. They just took me for a ride and took me to a bar.
   . . . .
Q. What did they do in the bar?
A. They asked for some drinks and they gave me a beer . . . . I was telling Jose for us to leave . . . .
   . . . .

inconsistent with his statements at the time of arrest, the prosecutor conducted the following cross-examination of the defendant:

BY PROSECUTING ATTORNEY:

Q. [Y]ou didn't tell Agent Murray, did you, that you had been set up by Jose Angel Ortega?

A. Because he didn't let me speak. He told me, "You have a right to remain silent. Don't speak." That's why I didn't speak.

Q. Well, he asked you where Jose Angel Ortego lived, didn't he?

A. Yes.

Q. And you didn't tell Agent Murray, did you, that, "I just left a bar in Tijuana with the owner of this car"?

A. Because he didn't let me explain everything to him.

Q. So you mean there was no opportunity for you to tell Agent Murray where you had been before coming to the Port of Entry?

A. No.

Q. There was no opportunity for you to tell Agent Murray where you had come from?

A. He didn't let me speak.

Q. But he let you tell him the address of Jose Angel Ortega, didn't he?

A. I told him where he could find him.

A. ... Jose told me, "If you want to leave, here are the keys, and leave," and I said, "Who shall I give the station wagon to?" He said, "Don't worry, we'll look for you. We'll leave tomorrow or day after, since you don't like to be here." ....

. . . .

Q. Where did you go? What happened?
A. I took the station wagon .... I told him I was going to park the station wagon there at the parking lot....

. . . .

Q. ... Where did you go after you got into the car?

. . . .

A. To the Port of Entry.
Q. Now, what happened there?
A. I arrived. The officer asked me ... citizenship, or something like that, and I took out my green card, and he asked me, "Where are you coming from?" I said, "Tijuana." "What were you doing in Tijuana?" "Just going for a ride." ....

. . . .

Q. And you said an address in Santa Ana, didn't you?

A. Yes.

Q. But you didn't tell him that you had just been with Mr. Jose Angel Ortega a half—a short time before you were arrested; you didn't tell him that, did you?

A. Because he told me to be quiet.

Q. Now, you also told Agent Murray, didn't you, that you had left Santa Ana and had come to Tijuana to see a friend or have some fun, didn't you?

A. He didn't understand me. I told him with a friend.

Q. So you had time to tell him you had come with a friend, didn't you? You had an opportunity to tell him that, didn't you?

A. Because he asked me.

. . . .

Q. During the entire time that you were being questioned by the agent, you never told them [sic] that you could lead them to Jose Angel Ortega right then, did you?

A. No, because he asked me, "Who is the owner of the car," and I told him.

Q. And you didn't tell him where he was right at that minute, did you?

A. I told him where he lived.

He took me inside. I sat down. Later, when another one called me and put me in a little room, and ... then a little while later two men arrives and told me—they read a letter to me where they said I had a right to have an attorney. And I told them I didn't need an attorney ....

And then he told me it was heroin, and from there he put me in and he asked me whose car is it, and I said "Jose Angel Ortega's." He said, "No, it's an American's." I said, "No, it's Jose's." He said, "It's to an American. It's registered to such." I said, "No, it's Jose's."
Q. Were you asked were Jose Ortega lived?
A. No.
Q. Do you recall indicating anything about where he could be found?
A. Yes .... On Standard Street in Santa Ana. They asked me what address, and I told them I just knew it was Apartment 6, but I didn't know the numbers of the apartment.

**Q.** And you didn't tell him where he was right then, did you? You didn't tell him that he was in a bar in Tijuana right then, did you?

**A.** No. It's that he didn't let me speak. He told me, "You have the right to remain silent and be quiet." So I remained silent . . . .

If defendant had invoked his right to remain silent in response to *Miranda* warnings, questioning that asked why certain information had not been revealed would have been improper. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *Bradford v. Stone*, 594 F.2d 1294 (9th Cir. 1979) (per curiam).

The Supreme Court, in *Hale* and *Doyle*, held that due process prohibits impeaching a defendant's testimony at trial by using his silence following *Miranda* warnings. In these cases, the defendants had elected to remain silent and said nothing to the officers who attempted to interrogate them. The Court noted that "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." *Doyle v. Ohio*, 426 U.S. at 617, 96 S.Ct. at 2244.

Ochoa-Sanchez did not remain silent in response to *Miranda* warnings. He waived his right to remain silent and responded to the agent's questions. In such a situation, we believe the controlling authority to be *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), in which the Court distinguished *Doyle* as follows:

> But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Id.* at 408, 100 S.Ct. at 2182.

In *Charles* the Court held permissible cross-examination about prior inconsistent statements. The prosecutor several times asked the defendant why he did not reveal to the police the version of events to which he testified at trial. The questions, taken as a whole, did not focus on the defendant's exercise of the right to remain silent, but instead focused on why he had failed to tell the police he took the victim's car from a parking lot, as he testified at trial, rather than from the street as he stated upon his arrest. *Id.* at 408–09, 100 S.Ct. at 2182.

In *Grieco v. Hall*, 641 F.2d 1029 (1st Cir. 1981), the First Circuit accurately construed the *Charles* case. It wrote:

> [O]nce a defendant makes post-arrest statements that may arguably be inconsistent with the trial story, inquiry into what was not said at arrest may be designed not "to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement . . . . Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of silence . . . ."

*Id.* at 1034 (quoting *Anderson v. Charles*, 447 U.S. at 409, 100 S.Ct. at 2182).

When the defendant offers testimony at trial that differs from his post-arrest statement, he raises a question of credibility. The jury must determine whether to believe the version of events to which the defendant testifies at trial or the version he revealed to the police when arrested. In such a situation, the jury is entitled to all the relevant evidence bearing on credibility. The prosecutor, to provide this evidence, may probe all post-arrest statements and the surrounding circumstances under which they were made, including defendant's failure to provide critical details. *See Lofton v. Wainwright*, 620 F.2d 74, 78–79 (5th Cir. 1980).

The trial transcript reveals that defendant's version of the events of his trip into and return from Mexico is quite different from the version he proposed to agent Murray upon his arrest. When he was arrested he claimed that he had borrowed the car

from a friend who lived in Santa Ana, that he had driven to Tijuana to visit a friend, and that he was returning. At trial, he asserted that he had hesitatingly accompanied two specific acquaintances to a bar in Tijuana and had assumed control of the car only a short time before. Several other portions of his trial testimony arguably are inconsistent with his post-arrest statements, but they need not be described in detail. It is sufficient if the statements, taken as a whole, reveal an inconsistency. *See Anderson v. Charles*, 447 U.S. at 408–09, 100 S.Ct. at 2182.

Moreover, we do not believe the prosecutor was attempting to draw meaning from the defendant's silence. The questioning clearly related specifically to details that defendant offered at trial but failed to reveal at the time of his arrest. As in *Charles*, the questions, by focusing on agent Murray's testimony, resolved any potential ambiguity. "The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id.* at 409, 100 S.Ct. at 2182.

For these reasons, we hold that defendant's due process rights were not violated by the prosecutor's cross-examination. Our resolution of his contention regarding the cross-examination also precludes defendant's success on his other claims. He asserts similar arguments about the prosecutor's direct examination of agent Murray and his closing argument.

Because defendant's trial testimony raised an issue of credibility, which opened to the prosecutor the circumstances of his post-arrest statement, the prosecutor's examination of agent Murray[2] properly revealed the limits of defendant's statement at time of arrest. Similarly, the prosecutor argued vigorously in closing argument about the credibility of defendant's trial testimony,[3] but stopped short of inviting a conviction from his silence.

2. Defendant objects to the following portions of agent Murray's testimony:

BY THE PROSECUTOR:

Q. Now, you stated he first stated he came down to visit a friend?

A. Yes.

Q. Didn't he tell you he had come down from the United States with any friends?

A. No, he didn't tell me that, no.

. . . .

Q. So he was saying it was a friend of a friend had loaned him the car?

A. Yes, sir.

Q. And did you ask him who this second friend was?

A. Yes, sir.

Q. And what did he respond? If anything?

A. Nothing.

. . . .

Q. Did he offer to help you locate the friend that had loaned him the car?

A. No . . . . At that point, no.

. . .

Q. . . . . Did he say anything to you to indicate that he knew where Mr. Ortega was at that time?

A. Where he was at that time? At that specific time, no, at that instance, no.

Q. Did he say that he had come from Santa Ana with Mr. Ortega?

A. No, sir.

Q. Did he tell you where you could locate Mr. Ortega?

A. No, sir.

Q. Did he mention to you a Mr. Santillon?

A. No, sir.

Q. Did he attempt—Did he say anything to you which indicated that he believed that he had been set up in this transaction?

A. No, sir.

Q. Did he tell you he had met with the owner of the car in Tijuana shortly before driving to the Port?

A. No, sir.

Q. Did he express any resentment regarding this Mr. Ortega?

A. No, sir.

. . . .

Q. Well, did Mr. Ochoa provide you with any more information which would have enabled you to locate this individual?

A. No, sir, that's all he gave me.

3. The following portions of the prosecutor's closing argument to the jury are in issue:

BY THE PROSECUTOR:

Agent Murray asked him who the friend was that the defendant had borrowed the car from, and the defendant would not identify this friend.

. . . .

In addition, when the defendant was arrested, he was informed that that car that he was driving contained heroin. He was told that he was under arrest, and that he realized that he was going to be going to jail. Now, what would you expect, based upon just your reason and common sense of how a person would react if they were truly innocent and truly unaware that there was heroin in their car? If they were arrested, found at the Port of Entry

## II.  *The Defense Subpoena*

■ On the morning of the trial, the district court quashed a defense subpoena that requested all information about all past cases in which a prosecution witness, an informant, had provided information to the police.  The judge refused an in camera inspection and refused to seal the records for appellate review.  The defendant claims a Sixth Amendment violation.

The government offered testimony that the informant began providing information about the defendant about a month after the defendant's arrest and that he was not paid for the information.  The witness revealed that the informant had worked for the police department for a year, receiving about $500 for his services.

The defendant fails to identify any potentially relevant use for the files and acknowledges that the request was designed to "determine what materials could be used to impeach the witness."  The court properly quashed the subpoena because the files were irrelevant and disclosure could destroy their confidentiality.  *See United States v. MacKey,* 647 F.2d 898, 901 (9th Cir. 1981); *United States v. McGrady,* 508 F.2d 13, 18 (8th Cir. 1974), *cert. denied,* 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975).  More-over, by asking for all information in all cases, the subpoena was overbroad.  *United States v. Wencke,* 604 F.2d 607, 612 (9th Cir. 1979).

The cases cited by defendant are inapposite.  They relate to situations in which, without the requested information, the defense was completely unable to cross-examine a government witness about potentially impeaching events and circumstances.  *See, e.g., Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *United States v. Alvarez-Lopez,* 559 F.2d 1155 (9th Cir. 1977).  In contrast, defendant conducted a meaningful cross-examination using impeaching information that the witness was an informant and had assisted the government in other cases.

■ The trial court acts in its discretion in deciding whether to quash a subpoena.  *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).  Presumably, in camera inspection of the files and sealing them for appellate review would have been the preferable practice.  But the court's failure to do so is not fatal.  *See United States v. Lyons,* 567 F.2d 777, 783 (8th Cir. 1977), *cert. denied,* 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978).

and told that there was heroin in your car, you're under arrest, and you're going to jail, if they were truly innocent?  Wouldn't you expect the person to respond, "Wait," words to that effect, or "wait a minute, I've been set up.  I just came from Tijuana with the owner of this car," or, "wait a minute.  I didn't drive this car down to Mexico," or some shock and surprise, some statement of "I've been set up," or would you expect that innocent person to respond, "Well, I borrowed the car, well, from a friend of a friend," and then later, "Yes, that friend's name is Jose Ortega.  Yes, he lives in Standard Street in Santa Ana.  I don't have the exact address."

Which would you expect an innocent person—how would you expect an innocent person to react at the time that he is caught with heroin?  . . . .

. . . .

Now, he's at the border.  That car is searched and he's told, "Mr. Ochoa, there is heroin found in your car.  You're under arrest.  Who does that car belong to?"  If he was set up by these guys, why wouldn't he say, "I just left people in Tijuana who drive that car down, and they just gave me the keys this morning.  I don't know anything about that car.  I—I didn't have anything to do with it."

Why would he make evasive answers?  Why would he sit there and say, "I borrowed it from a friend of a friend," and not direct—not try to lead the agents to the people who loaned them the car?  Not try to tell them where he had been, with whom.  Just to say, "I drove down from Santa Ana," et cetera.  It's not credible, this defense that he now offers.

. . . .

He also gave [agent Murray] all the biographical information:  Name, address, et cetera, and he's trying to tell you that he didn't have an opportunity to proclaim exactly how—that he was set up.  It just doesn't—it's an incredible statement, and if it is incredible, if he is not telling you the truth, I mean, if the reason he didn't tell agent Murray that he was set up, if he didn't tell agent Murray that Jose Angel Ortega was in Tijuana right then, was the reason that he didn't have an opportunity, or that he didn't want agent Murray to know where Jose Angel Ortega was right then.

### III. Addict-Witness Instruction

The defendant claims error in the trial court's refusal to instruct the jury concerning its evaluation of testimony of an addict.

The informant testified that he had been addicted to heroin, but that he last had used the drug four weeks before trial. The defense counsel adequately cross-examined about the drug use and directed him to reveal to the jury his arms, which contained needle marks.

■ An addict instruction is appropriate when a witness is a heroin addict, *People of the Territory of Guam v. Dela Rosa*, 644 F.2d 1257, 1261 (9th Cir. 1980); *United States v. Bernard*, 625 F.2d 854, 858 (9th Cir. 1980), but is unnecessary in several situations, including: (1) when the addiction is disputed, *United States v. Gregorio*, 497 F.2d 1253, 1262 (4th Cir.), *cert. denied*, 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974); when the defense adequately cross-examines the witness about the addiction, *United States v. Cook*, 608 F.2d 1175, 1182 (9th Cir. 1979), *cert. denied*, 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 760 (1980); and (3) when another cautionary instruction is given, *United States v. Tousant*, 619 F.2d 810, 812 (9th Cir. 1980). *See generally United States v. Hoppe*, 645 F.2d 630, 633 (8th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 170, 70 L.Ed.2d 138 (1981).

■ At trial in this case, present addiction was not established, the defense conducted a vigorous cross-examination, and the judge gave other cautionary instructions. The court did not abuse its discretion in refusing the requested instruction. *See United States v. Cook*, 608 F.2d 1175, 1182 (9th Cir. 1979), *cert. denied*, 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 760 (1980).

### IV. Prosecutorial Misconduct

■ The government attempted to elicit from defendant's former attorney that he withdrew from the case because he believed the defendant would lie on the stand. The government acknowledges the attempt.

■ Although the defendant probably is correct in asserting that the question was improper, the court did not abuse its discretion in refusing to grant a mistrial. Prosecutorial misconduct must be evaluated in the context of the entire trial. It justifies reversal only when it denies the defendant a fair trial. *United States v. Ford*, 632 F.2d 1354, 1381 (9th Cir. 1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981).

The improper question was an isolated incident in a trial lasting several days. The answer was favorable to the defendant, and defendant makes no assertion that the question was offered in bad faith. He fails to identify any prejudice.

In such a posture, any misconduct that did occur does not require reversal. *See United States v. Tham*, 665 F.2d 855, 860 (9th Cir. 1981); *United States v. Berry*, 627 F.2d 193, 196–97 (9th Cir. 1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981).

### CONCLUSION

The prosecutor commenced this case with ample evidence. A conservative trial strategy would have resulted in a conviction, presenting the defendant with none of the difficult issues he has raised for our consideration. Instead, the prosecutor engaged in overkill. Nevertheless, defendant received a fair trial, and none of his rights were violated.

The convictions are AFFIRMED.

FLETCHER, Circuit Judge, dissenting:

I dissent because the majority lose sight of the general rule that post-arrest silence may not be used against a defendant and improperly seek to bring the facts of this case within the limited exception to that rule set forth in *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).

The Supreme Court, in *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), and *United States v. Hale*, 422 U.S. 171, 180–81, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975), held that it is a deprivation of due process to impeach a defend-

ant's testimony at trial with his post-arrest silence that followed *Miranda* warnings. In *Doyle* and *Hale*, the defendants elected to remain silent and said nothing to the officers who attempted to interrogate them.

The rule in *Doyle* does not apply, however, to cross-examination that "merely inquires into prior inconsistent statements." *Charles*, 447 U.S. at 408, 100 S.Ct. at 2182.

Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. *As to the subject matter of his statements*, the defendant has not remained silent at all.

*Id.* (Emphasis added.)

The facts of this case do not exactly fit the pattern of either *Doyle* or *Charles*. In *Doyle*, the defendant remained completely silent, while in *Charles*, the defendant's testimony was clearly inconsistent with his prior statements. In contrast, Ochoa-Sanchez did not maintain strict silence after arrest. He made some post-arrest statements, less complete than his trial testimony but not inconsistent with it.[1]

During the detention following arrest, Ochoa-Sanchez was constantly reminded by the officers that he had a right to remain silent, that he need not answer the questions put to him. Silence was invited and yet some response encouraged. Apparently, in an attempt at cooperation, the defendant gave some information. If, indeed, there were perceived inconsistencies between the incomplete responses elicited from the defendant upon arrest and the more complete story given at trial, the focus of the prosecution should have been to probe those inconsistencies as authorized by *Charles*. Instead, the cross-examination of Ochoa-Sanchez, the examination of the arresting officer, and the prosecution's closing argument all focused on the silence of the defendant.

For example, on direct examination, the arresting officer was asked,

Q. Did [the defendant] attempt—did he say anything to you which indicated that he believed he had been set up in this transaction?

and he responded,

A. No, sir.

Q. Did he tell you he had met with the owner of the car in Tijuana shortly before driving to the Port?

A. No, sir.

Similarly, the cross-examination of the defendant focused on what he failed to say. Each of the pertinent questions is of the form, "You didn't tell Agent Murray that ...?"

In his closing argument, the prosecutor actively invited the jury to draw adverse inferences from Ochoa-Sanchez's failure voluntarily to provide information to the arresting officers.[2] The prosecutor made fanciful statements about what the hypothetical innocent man would say upon arrest.[3] He implied that Ochoa-Sanchez

---

1. Furthermore, Ochoa-Sanchez's testimony at trial raises serious doubt as to whether he knowingly waived his right to remain silent. There appears to have been a significant language difficulty. The various quotes of his testimony in the majority opinion highlight this problem.

2. This circuit has previously held that such comments in closing arguments are inappropriate. *Bradford v. Stone*, 594 F.2d 1294, 1296 (9th Cir. 1979).

3. The Fifth Circuit applies the most expansive interpretation of the prosecutor's right to impeach with post-arrest silence. *See, e.g., Lofton v. Wainwright*, 620 F.2d 74, 78 (5th Cir. 1980); *see also United States v. Beechum*, 582 F.2d 898, 906 (5th Cir. 1978), *cert. denied*, 440

U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). That circuit appears to allow post-arrest silence to be used whenever the defendant does not maintain total silence after arrest. *Lofton*, 620 F.2d at 78. Even when the post-arrest statements are not inconsistent with later testimony, but relate to different subjects, any omissions on the part of the defendant may be used to impeach him at trial. *Beechum*, 582 F.2d at 906. It is doubtful that even the Fifth Circuit, however, would permit the prosecutor's comments in closing argument suggesting that an innocent man has an affirmative duty to inform.

Two other circuits appear to reject the Fifth Circuit's rule for use of post-arrest silence. *See Grieco v. Hall*, 641 F.2d 1029, 1034–36 (1st Cir. 1981); *United States v. Curtis*, 644 F.2d

failed to display the degree of cooperation with the police that would demonstrate his innocence; without explaining to the jury that the officer had given *Miranda* warnings, and had carefully explained to the defendant that he had no obligation to tell the police anything at all.

The result reached by the majority rewards the defendant's voluntary offering of some information, by permitting his impeachment at trial by improper use of his partial silence. A proper reading of *Miranda, Doyle,* and *Charles* belie such a result. I would reverse.

263, 270–71 and n. 4 (3d Cir. 1981). I am dismayed to see this circuit adopt a rule that I believe neither aids defendants nor promotes effective law enforcement.