William LOFTON, Jr.,
Petitioner-Appellant,

v.

Louie L. WAINWRIGHT,
Respondent-Appellee.

No. 79–1230.

United States Court of Appeals,
Fifth Circuit.

June 25, 1980.

Tatjana Ostapoff, Chief App. Div., Asst. Public Def., 15th Judicial Circuit of Fla., West Palm Beach, Fla., for petitioner-appellant.

Joy B. Shearer, Asst. Atty. Gen., West Palm Beach, Fla., for respondent-appellee.

Before BROWN, TJOFLAT and GARZA, Circuit Judges.

TJOFLAT, Circuit Judge:

The sole question on appeal in this habeas corpus proceeding, 28 U.S.C. § 2254 (1976), is whether the state prosecutor violated the prohibition of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), by using the petitioner's post-arrest silence to impeach an alibi subsequently offered by the petitioner at trial. We agree with the district court's finding that no violation occurred and affirm its denial of the writ.

I

The petitioner, William Lofton, Jr., was convicted in a Florida circuit court of robbing Leroy Brown of $1975. At 11:00 p. m. on the night of February 12, 1974, Brown was returning to his home in Gilford, Florida, after collecting the daily receipts from his business. When he arrived at his house, he got out of his car to open the gate to the driveway. As he was unlocking the gate, two men, a driver and a passenger, drove up in a blue Volkswagen and stopped by Brown's car. The driver was identified at trial as Lofton; the record does not disclose the identity of the passenger, indicating only that he, like Lofton, was a black male. The two men exited the Volkswagen and assailed Brown. During the encounter, they obtained possession of Brown's .38 caliber Colt revolver, shot him, and took his cash receipts. As the assailants were making their get-a-way, they drove the Volkswagen into a mailbox across the street.

In addition to the foregoing, the state's evidence established that, for several weeks prior to the robbery, Lofton had been visiting some relatives in Gilford. He returned to his home in Louisiana a few days after the robbery. Meanwhile, the Indian River County Sheriff's Department had launched an investigation of the crime. Brown eventually identified Lofton as one of his two assailants and as the driver of the Volkswagen. The Florida Division of Motor Vehicles' records revealed that Lofton owned the Volkswagen. With this evidence in hand, the sheriff sent Deputies Albert J. Pensch and Doyle Stroud to Louisiana for the purpose of bringing Lofton to Florida for trial on the robbery charge.

On June 13, 1974, the deputies took Lofton into custody, read him his *Miranda* rights, and took him by car to the airport in New Orleans. During the drive to the airport, the deputies and Lofton discussed the robbery. Pensch asked Lofton what he and his accomplice had done with Brown's revolver, and Lofton said that they "throw'd it in the river." Lofton did not want "to get anybody else hurt or anybody hurt anymore." When asked which river, Lofton pointed to the Mississippi River, along which they were driving at the time. Lofton was asked how much money he had gotten out of the robbery. He said he did not know because he had not counted it. On further questioning he admitted that, following the robbery, he and his accomplice had driven to a trailer park, where his cousin Doris Jones lived, and had been seen there counting the money. At this point during the questioning, Lofton said he wanted to see his lawyer, and the conversation ceased.

The state rested its case after Leroy Brown had identified Lofton as one of his assailants, Lofton's ownership of the Volkswagen and its presence at the scene of the robbery had been established,[1] and Lofton's admissions of June 13, 1974 to deputies Pensch and Stroud had been introduced. In recounting Lofton's post-arrest admissions, the deputies testified that Lofton had broken off the questioning by stating that he did not want to say anything more until he had talked to a lawyer. Lofton then took the stand in his own defense. He admitted ownership of the Volkswagen involved in the robbery but denied any participation in the crime. Lofton had an alibi—at the time the robbery was in progress he was with some friends at cousin Doris Jones's trailer. The only friend who testified at trial, however, was Doris Jones, and she was a prosecution witness. She could not account for Lofton's whereabouts for much of the evening, but did recall seeing him counting some money at one point.

On direct examination, Lofton admitted that he had discussed the crime with deputies Pensch and Stroud while en route to the New Orleans airport, but he denied that he made the inculpatory statements the deputies attributed to him. He cut off any meaningful questioning about the crime, he said, by invoking his right to remain silent. On cross-examination, the prosecutor sought to make the point that Lofton had fabricated his alibi defense on the eve of trial. Lofton acknowledged that he had not mentioned his alibi to the sheriff's deputies, though given the opportunity, but rejected any notion that the alibi had been trumped up. In his summation to the jury at the close of the evidence, the prosecutor completed his attack on the alibi defense by suggesting that it had been fabricated by Lofton to avoid the damaging impact that Lofton knew his post-arrest admissions would have on the jury.

## II

The petitioner contends that it was constitutionally impermissible for the prosecutor, first, to bring out the fact that the petitioner had exercised his right to terminate the post-arrest questioning, and, then, to argue to the jury that he should have disclosed his alibi to deputies Pensch and Stroud. This prosecution tactic, it is suggested, moved the jury to attach considerable importance to petitioner's exercise of his right to remain silent in weighing the credibility of his alibi and, finally, to reject the alibi altogether. This tactic, petitioner argues, falls squarely within the condemnation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). We disagree.

In *Doyle*, the defendants, unlike Lofton in this case, said nothing to the arresting police officers who attempted to question them except that they chose to exercise their constitutional right to remain silent. Their defense—that they had been framed—did not come to light until trial, when the defendants took the stand and testified. On cross-examination, the prosecutor was permitted, over objection, to inquire why they had not disclosed their frame-up story to the arresting officers. The defendants were forced to say, of course, that they had stood silent when the officers sought to question them and to admit that they had withheld from the police what was, plainly, an exculpatory story. The Supreme Court considered this prosecutorial practice fundamentally unfair and condemned it in these words:

> Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. . . . Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such

---

1. A short time after the robbery, Lofton's Volkswagen was involved in an accident in Jacksonville, Florida. The Indian River County Sheriff's Department picked up the report of the accident and sent two deputies, one being

Pensch, to Jacksonville to obtain paint scrapings from the car. The scrapings matched the paint removed from the mailbox that the Volkswagen rammed as it left the scene of the robbery.

assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 617–18, 96 S.Ct. at 2244–45 (citation and footnotes omitted).

We simply do not have a *Doyle* situation in the case before us. When the police interrogation commenced, Lofton chose not to remain silent; he elected to talk. He then proceeded to make some highly incriminating admissions—to the effect that he had committed the robbery, had counted out the proceeds and divided them with his accomplice, and had disposed of the revolver.

At trial, Lofton, in denying that he made these incriminating statements and in advancing the alibi, placed his testimony at complete odds with that given by deputies Pensch and Stroud. It would not have been possible for the jury to have reconciled the prosecution and defense versions of the truth in order to give credence to both. Rather, the jury was faced with the task of accepting one version or the other or, conceivably, neither. In discharging this task the jurors were entitled to every piece of evidence, save that clearly inadmissible under the constitution or the rules of evidence, which might have shed some light on the credibility of the inculpatory statements offered by the deputies, on the one hand, and Lofton's alibi, on the other. With regard to the former, the jury was entitled to receive not only the words that passed between the deputies and Lofton as they rode to the New Orleans airport, but, as well, a vivid picture of the circumstances under which the words were spoken. By the same token, the jurors were entitled to consider anything that might have indicated whether Lofton's alibi had been contrived for trial purposes, as the state contended, or reflected the truth.

By revealing to the deputies that he had participated in the robbery, Lofton tacitly admitted that he was not at his cousin's place when the crime occurred and that he had no alibi. Surely this tacit admission was something for the jurors to explore during their deliberations. Moreover, if the admission was a subject appropriate for discussion in the jury room, it follows that it was open to inquiry in the courtroom. Once it had been shown that Lofton had constitutionally submitted to police questioning and had conceded some involvement in the offense, the prosecutor, on cross-examination, had the right, if not the duty, to ask Lofton whether he had mentioned his alibi to the deputies and, if not, why not. In pursuing the point about what *was not* said during the police questioning, it was necessary, of course, for the prosecutor to bring out all that *was* said, including Lofton's final comment—that he would say nothing further without first talking to a lawyer.

Questioning such as that the prosecutor undertook in Lofton's case plainly aids in the quest for truth. In *Doyle*, however, the questioning added nothing; it only penalized the defendants for exercising their constitutional right to remain silent. We have recognized this difference in our precedent. In *United States v. Mireles*, 570 F.2d 1287 (5th Cir. 1978), we approved the use of a defendant's statements to an arresting officer following *Miranda* warnings to impeach inconsistent testimony given by the defendant at trial. Mireles had been caught driving a truck carrying 1805 pounds of hidden marijuana. He told the arresting officer that he had borrowed the truck to move his furniture and had no knowledge of the marijuana. At trial, Mireles changed his story and was confronted, on cross-examination, with his earlier statement to the officer. As in Lofton's case, the prosecutor brought out the fact that Mireles had not mentioned his trial version of the events to the officer at the time of his arrest. We rejected Mireles'. claim that this prosecutorial tactic was foreclosed by *Doyle*.

Defendant's silence was in no way at issue. . . . [T]he prosecutor's questions and argument were not an impeachment by silence, as in *Doyle*, but merely

an effort to impeach by prior statements that were inconsistent with defendant's testimony at trial. There is no "insoluble ambiguity" of silence as noted in *Doyle*, since defendant Mireles waived his right to remain silent, and denied knowledge of the presence of the contraband after his arrest. *Doyle's* protection of the right to remain silent does not apply to cross-examination and argument concerning a defendant's exculpatory explanation given after the *Miranda* warnings.

570 F.2d at 1293. *See United States v. Allston*, 613 F.2d 609 (5th Cir. 1980).

The impeachment by silence objection was raised in this court again in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). At the time of his arrest for possessing some silver dollars stolen from the mails, Beechum was in possession of other stolen property. Beechum made a brief statement to the postal inspector who arrested him, but offered no explanation for his possession of any of the stolen property. The prosecutor developed this point at trial before the jury. He also commented in closing argument about Beechum's failure to explain: " 'Mr. Beechum gave no explanation for his possession of the silver dollars. In fact, he told [the inspector], "you have all the answers, and I don't have any for you." ' " *Id.* at 906. We distinguished *Doyle*, observing that in *Doyle* the defendants had stood absolutely silent after receiving the *Miranda* caution while Beechum had not. *See United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc); *United States v. Berdick*, 555 F.2d 1329 (5th Cir. 1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 721, 54 L.Ed.2d 753 (1978). We concluded that "the prosecutor's statement [was] not a comment on Beechum's silence but rather an appraisal of what Beechum said. In effect, the prosecutor was saying, 'Beechum did not explain his possession of the [stolen property]. In fact, he admitted he had no explanation for it . . .' " 582 F.2d at 906. *See United States v. Agee*, 597 F.2d 350 (3d Cir.) (en banc), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979).

The petitioner argues that *Mireles* and *Beechum* are not controlling because the defendants in those cases never told the police that they wanted to exercise their right to cease talking, whereas Lofton did. He suggests that these cases would have been decided differently had the defendants terminated their conversations with the police by saying, "I want to stop talking," or "I want to see my lawyer now." We think not. Once an accused has waived his right to remain silent and has submitted to police questioning, he, of course, has no right to expect that the prosecution will be prevented from utilizing the statement he has given the police to impeach any contradictory statement he may make at trial. When a defendant chooses to contradict his post-arrest statements to the police, as Lofton did, it becomes proper for the prosecutor to challenge him with those statements and with the fact that he withheld his alibi from them. The defendant should also expect that the jury, in order to have the benefit of all the relevant evidence bearing on the credibility issue, may well learn that he terminated his revelations to the police by exercising his right to silence or to the assistance of counsel.

The manner in which Lofton broke off his statements to the two deputies first came to the jury's attention when the deputies testified on direct examination—during the Government's case-in-chief. In *United States v. Staller*, 616 F.2d 1284 (1980), we cautioned against the prosecutor's disclosure, in introducing the defendant's post-arrest statements into evidence in the Government's case-in-chief, of the defendant's exercise of his right to remain silent. At that point in trial, the credibility of those statements is generally not in issue, and the fact that the statements may have been concluded because the defendant exercised his right to remain silent or to the aid of counsel may be of little probative value, if not irrelevant. However, where the defendant takes the stand and contradicts his post-arrest statements, thus raising issues of credibility, all of the post-arrest utter-

ances and the circumstances under which they were made may well become relevant and admissible, as they did in Lofton's case. In light of the ultimate admissibility of testimony about Lofton's termination of his statements to the deputies, it is evident that Lofton could not possibly have been unjustly prejudiced by the deputies' direct examination testimony that Lofton had asked for a lawyer and had invoked his right to remain silent. In any event, here, as in *Beechum*, the defendant *waived* any objection he might have had to the Government's order of proof when he took the stand in his own defense and made statements inconsistent with his post-arrest admissions. 582 F.2d at 916–17.

For the foregoing reasons, the district court decision is AFFIRMED.