**Ronald BROGDON,**
**Petitioner–Appellant,**

v.

**Robert H. BUTLER, Sr., Warden,**
**Louisiana State Penitentiary, et**
**al., Respondents–Appellees.**

No. 86–4743.

United States Court of Appeals,
Fifth Circuit.

Feb. 29, 1988.

Ronald Brogdon, pro se.

William E. Tilley, Dist. Atty., Barbara B. Rutledge, Asst. Dist. Atty., Leesville, La., William J. Guste, Jr., Atty. Gen., Baton Rouge, La., for respondents-appellees.

Before CAROLYN DINEEN KING[*] and DAVIS, Circuit Judges, and FELDMAN,[**] District Judge.

W. EUGENE DAVIS, Circuit Judge:

Pro se appellant Ronald Brogdon challenges the district court's dismissal of his petition for habeas corpus relief. We affirm.

## I.

In the early morning of October 12, 1980, Ronald Brogdon and some friends joined a beach party at a lake in Vernon Parish, Louisiana. A brawl developed between a group of local youths and some soldiers from a nearby Army base. A soldier named L'Antigua died from stab wounds.

The police first questioned Brogdon at three o'clock the afternoon following the stabbing. After receiving his *Miranda* warnings, Brogdon said that he knew nothing about the stabbing. When the police officers informed Brogdon that some thirty witnesses had given statements implicating him, Brogdon admitted that he stabbed the soldier, protesting "I had to cut him to get him off of me." Brogdon then refused to give a written or taped statement. After answering questions about the knife and the shirt that he had been wearing the evening before, Brogdon accompanied the two police officers on a search for the knife. When the group returned to police headquarters, Ronald Brogdon was booked with second degree murder.

At trial, Brogdon testified in his own defense and denied making the statement attributed to him by the investigating offi-

---

[*] Formerly Carolyn Dineen Randall.

[**] District Judge of the Eastern District of Louisiana, sitting by designation.

cers. Brogdon complains that the prosecutor adduced testimony from the two investigating officers, Spurgeon and Horton, that Brogdon gave the officers no further explanation of the crime after he admitted stabbing L'Antigua "to get him off me." The jury found Brogdon guilty of second degree murder; the court sentenced him to life at hard labor.

■■■ Brogdon raises two interdependent issues on appeal. First, he argues that the prosecutor impermissibly referred to the defendant's post-*Miranda* silence at trial in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). If

defense counsel's failure to contemporaneously object to these references precludes the court from granting habeas relief on this claim, Brogdon argues second that he is nevertheless entitled to habeas relief because his attorney's failure to object constitutes ineffective assistance of counsel.[1]

## II.

■■■ We consider first Brogdon's claim that his due process rights were violated when the prosecution referred at trial to the defendant's post-arrest, post-*Miranda* silence.[2] Brogdon argues that it was con-

1. Brogdon raises two additional points that are closely related. First, he argues that he was deprived of due process because the trial court refused to excuse for cause a prospective juror who disclosed on voir dire that: (1) she was married to a law enforcement officer, and (2) her uncle by marriage was an investigator for the district attorney's office. The district court correctly concluded that the trial court's denial of the challenge for cause was within the latter court's discretion. Based on an affidavit from a fellow juror, Brogdon argues next that he was deprived of due process because the juror described above was guilty of misconduct during the jury's deliberations. Relying on La.R.S. § 15:470, the district court correctly disregarded the juror's affidavit about the jury's deliberations. For these reasons and others assigned by the district court, we affirm the rejection of habeas relief on these claims.

2. Brogdon's claim is predicated on the following testimony of the two investigating officers:

Q. All right, sir. Was the defendant, Ronald Brogdon, advised that he was a suspect in the death of Craig L'Antigua?
A. Yes, sir.
Q. All right, sir. And, tell us, sir, about what the nature and the content of the interview that you had with Craig—rather with Ronald Brogdon—what was that interview?
Q. [sic] O.K. He was advised of his rights and the nature of this and at first, he didn't know anything about it and we advised him we knew everything about it and he went ahead and told us.
Q. What did he tell you?
A. He told us that he had to cut him to get him off of him.
Q. He had to cut him to get him off of him?
A. Yes, sir.
Q. Tell us everything that Ronald Brogdon told you.
A. He advised us that they had been drinking that night. There was a fight. Some how or another they got into it. He had to cut

him to get him off of him. And that's all he would say at that point.
    *    *    *    *    *    *
Q. Were there any questions concerning the fact as to whether or not the victim was armed? Why he had to get him off of him?
A. No, sir.
Q. Are there any other questions that you propounded to him?
A. No, sir.
Q. Were there any other answers or explanations that he gave to you?
A. No, sir.
Q. Was there any questions [sic] relative to the items that you were searching for?
A. No, sir.
    *    *    *    *    *    *
Q. Were any denials of any sort ever made by Ronald Brogdon?
A. No, sir.
Q. When he was arrested for the murder of Craig L'Antigua did he make any denials?
A. No, sir.
Q. Were any—when he was arrested for the murder of Craig L'Antigua—were there any denials or statements of self-defense given?
A. No, sir.
Q. What, then sir, was the only thing he told you when he was told that he was charged with murder? Who did he want to see?
A. His lawyer.
Trial transcript at 57–58, 97 (testimony of Detective Spurgeon). The prosecutor posed the following questions to Deputy Sheriff Horton:
Q. All right. What was the response that the defendant gave you when you advised him that you wanted to interview him about the death of Craig L'Antigua?
A. His first response was—he said, "I don't know what you are talking about."
Q. All right. And after that, tell us about the interview.
A. Then after that, he told me, he says—I said, "Did you stab the man?" He said,

stitutionally impermissible for the prosecutor to reveal to the jury that petitioner had exercised his right to terminate the officer's questioning. Brogdon contends that this violation was compounded when the prosecutor argued that Brogdon should have disclosed to the officers the identical factual version of the soldier's death that he presented in his trial testimony. Brogdon urges that this conduct by the prosecutor caused the jury to consider the petitioner's exercise of his right to remain silent in weighing and ultimately rejecting the credibility of his testimony. Petitioner contends that this tactic is condemned by *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed. 2d 91 (1976).

In *Doyle*, the Court held that the due process clause of the fourteenth amendment prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings. The case involved two defendants who made no postarrest statements about their involvement in the crime.[3] Both defendants in *Doyle* testified at trial that they had been framed. On cross-examination the prosecutor asked the defendants why they had not told the frameup story to the police upon their arrest. The court considered this prosecutorial practice fundamentally unfair in the face of the accused's right to remain silent.

Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insoluably ambiguous because of what the state is required to advise the person arrested.... Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 617–18, 96 S.Ct. at 2244.

But if an accused disregards the *Miranda* warnings—does not elect to remain silent and speaks to the investigating officers about the crime under investigation—*Doyle* does not prohibit the prosecutor from impeaching the defendant's in-court testimony with inconsistent statements he made to the police officers.

In *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), the accused was arrested for first degree murder after he was apprehended driving the victim's car. When questioned about the car, Charles said that he stole the car from an area about two miles from the bus station. He testified at trial, however, that he stole the car from a business located adjacent to the bus station. On cross-examination, the prosecutor sought to impeach Charles with his prior inconsistent statements to the investigating officers. Further, the prosecutor questioned Charles' failure to tell the arresting officers the story that he now claimed was true.

Reversing the Sixth Circuit, the Supreme Court concluded that the questioning was not prohibited by *Doyle*. The Court reasoned that *Doyle* protected only those defendants who remain silent. "Such questioning makes no unfair use of silence, because the defendant who voluntarily

---

"Yes, I stabbed him. I had to to get him off of me."

Q. Tell us everything else he told you during that interview.

A. And after he said that, he said, "I don't want to"—again he said, "I don't want to give you a written statement or a taped statement."

Q. All right. At any time did he tell you anything else in reference to the stabbing or cutting of Craig L'Antigua?

A. That's all he told me.

Q. Did he ever give you any reasons or other denials of the stabbing of Craig L'Antigua?

A. No reason.

*Id.* at 207–08 (testimony of Deputy Sheriff Horton).

**3.** One of the defendants, when told by investigating officers the reason for his arrest, made statements such as "I don't know what you are talking about." However, the Court in *Doyle* analyzed the question presented as if both defendants had remained silent. *See Anderson v. Charles*, 447 U.S. 404, 407, n. 2, 100 S.Ct. 2180, 2181, n. 2, 65 L.Ed.2d 222 (1980).

speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* at 408, 100 S.Ct. at 2182, 65 L.Ed.2d at 226. Considering the questioning as a whole, the Court determined that the prosecutor did not focus on the defendant's exercise of his right to remain silent, but rather on why, if his trial testimony were true, he did not tell the officers the story to which he testified in court. "The questions were not designed to draw meaning from silence, but to elicit an explanation for prior inconsistent statements." *Id.* at 409, 100 S.Ct. at 2182, 65 L.Ed.2d at 227.

We reached a result consistent with *Charles* in *Lofton v. Wainwright,* 620 F.2d 74 (5th Cir.1980). In *Lofton,* the defendant was arrested for robbery and after receiving *Miranda* warnings made several inculpatory statements to police officers before invoking his right to remain silent. At trial, the police officers testified to Lofton's postarrest statements.[4] The officers also testified that the discussion terminated when Lofton said he wanted to see his lawyer. When Lofton took the stand, he offered an alibi defense that was inconsistent with his statement to the officers. The court permitted the prosecutor to ask Lofton why he had not told the officers about his alibi. Lofton admitted talking with the police officers but denied making the incriminating statements attributed to him. The prosecutor argued to the jury that Lofton's failure to disclose his alibi defense to the police officers suggested that it had been fabricated to avoid the impact of the postarrest statements. In affirming the denial of habeas relief to Lofton, we stated:

> When the police interrogation commenced, Lofton chose not to remain silent; he elected to talk....
>
> It would not have been possible for the jury to have reconciled the prosecution and defense versions of the truth in order to give credence to both.... [T]he jury was entitled to receive not only the words that passed between the deputies

and Lofton ... but, as well, a vivid picture of the circumstances under which the words were spoken. By the same token, the jurors were entitled to consider anything that might have indicated whether Lofton's alibi had been contrived for trial purposes, as the state contended, or reflected the truth....

> .... Once it had been shown that Lofton had constitutionally submitted to police questioning and had conceded some involvement in the offense, the prosecutor, on cross-examination, had the right, if not the duty, to ask Lofton whether he had mentioned his alibi to the deputies, and, if not, why not. In pursuing the point about what *was not* said during the police questioning, it was necessary, of course, for the prosecutor to bring out all that *was* said, including Lofton's final comment—that he would say nothing further without first talking to a lawyer.

*Id.* at 77 (emphasis in original). We are persuaded that the facts of this case fit within the exception to *Doyle* articulated by *Charles* and *Lofton.*

Brogdon gave a substantive post-*Miranda* statement to the investigating officers about how the stabbing took place: "I had to cut him to get him off me." At trial, however, Brogdon denied making this statement to the police and gave a version of the incident inconsistent with his pretrial statement. He testified at trial that four to six men appeared to be preparing to attack him; he held his open knife at his side to defend himself in case they did attack. L'Antigua suddenly charged him and collided with the open knife. He denied that he attempted to stab L'Antigua; he considered the incident an "accident."

The state's evidence tended to show that Brogdon, who is 6'2" tall, and L'Antigua, who was only 5'6" tall, were fighting. During this fight, Brogdon pulled a knife and intentionally stabbed the smaller L'Antigua, who was unarmed. The key to Brogdon's defense was his credibility. As

**4.** Lofton told the officers where he disposed of the gun used in the robbery, he denied knowing how much was stolen because he did not count it, and he disclosed some of his movements after the robbery.

in *Lofton,* the jurors were entitled to consider whether Brogdon's "accident" version of the stabbing had been contrived for trial or whether it was true. As in *Lofton,* it was also permissible for the prosecutor to reveal to the jury what Brogdon did *not* say to the police to demonstrate that Brogdon made no effort to tell the officers his "accident" version of the stabbing.

The prosecuting attorney's questions regarding Brogdon's failure to tell police the same story he told at trial was permissible to impeach Brogdon's prior inconsistent statement. The responses to those questions were properly admitted into evidence. Further, because the questions were proper, there was no need for defense counsel to object to them at trial and counsel's failure to object obviously does not constitute ineffective assistance of counsel. For these reasons, the district court's denial of Brogdon's petition for habeas corpus relief is affirmed.

AFFIRMED.