**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Isidro MORALES, Defendant-Appellant.**

No. 87–2858.

United States Court of Appeals,
Fifth Circuit.

Aug. 19, 1988.

Jesus Maria Alvarez, Rio Grande City, Tex., for defendant-appellant.

Frances H. Stacy, James R. Gough, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before GEE, DAVIS and SMITH, Circuit Judges.

GEE, Circuit Judge:

The issues on this appeal arise from references made at trial to the failure of the appellant, at the time of his arrest, to explain to the arresting officers that he was conducting an undercover operation as he later claimed. Appellant Morales contends that these references infringe the rule of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

## Facts

Appellant Isidro Morales was Constable of Precinct 3, Brooks County, Texas. Undercover DEA Agent Tittle, acting on a confidential tip that Morales was corrupt, approached Morales indirectly by means of a taped telephone conversation and solicited his help in smuggling drugs. Morales initially appeared reluctant but eventually agreed to help. Morales enlisted the aid of an accomplice and arranged to transport a small "test load" of marijuana.

On the day before the scheduled test run, Agent Tittle and his informant again met with Morales. Agent Tittle tried to give an agreed upon $500 to Morales who said, "No, don't give it to me. Give it to [my accomplice]...." [1] Agent Tittle nevertheless gave Morales the cash. Morales turned and gave it to his accomplice. As Agent Tittle left this meeting he signaled his colleagues, who moved in to arrest Morales and his accomplice.

The Brooks County Sheriff, with whom Morales was acquainted, accompanied the federal agents. Sheriff Castellano stopped his vehicle and asked Morales in Spanish, "What happened, Isidro?" Morales replied in Spanish, "I don't know why these men are bringing me here." Morales said nothing further. Morales received Miranda warnings, and though the record is unclear we shall assume that they were given before Castellano's question. Four to five

hours after the arrest, Morales informed the DEA agent that he had been conducting his own undercover investigation and had agreed to aid in the smuggling scheme because he believed that the agent and the informant were drug traffickers.

At trial, Morales maintained that he was involved in the smuggling scheme in an undercover capacity, attempting to arrest Agent Tittle and the informant. He also presented an entrapment defense. The prosecutor contended that Morales contrived his "undercover investigation" defense during the four-hour period after his arrest. The government relied on Morales's post-arrest silence to support this theory, and both the prosecutor and the trial judge questioned him regarding it without objection by the defense.

## Analysis

*Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) prohibits the use of post-arrest, post-Miranda silence to impeach a defendant's trial testimony. In *Doyle,* when defendant was arrested on drug charges he said "I don't know what you are talking about" or "you got to be crazy." 426 U.S. at 614 n. 5, 96 S.Ct. at 2243 n. 5; *id.* at 622 n. 4, 96 S.Ct. at 2247 n. 4 (Stevens, J., dissenting). At trial, Doyle testified that he had been framed. The state introduced his post-arrest "silence" to impeach his testimony, arguing that Doyle's post-arrest failure to assert his innocence undermined his trial testimony. The Court held that this violated the fifth amendment because the silence is presumed to be an exercise of Miranda rights.

■ *Doyle* and its progeny, however, recognize that if a post-Miranda statement is inconsistent with defendant's trial testimony, the inconsistent statement and subsequent silence or failure to explain the statement is admissible to impeach the defendant. *See id.* at 617 n. 7, 96 S.Ct. at 2244 n. 7; *Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980); *Brogdon v. Butler,* 838 F.2d 776, 779 (5th Cir.1988); *Lofton v. Wain-*

---

1. The accomplice was on probation for a con- viction of stealing guns.

*wright,* 620 F.2d 74, 78 (5th Cir.1980). Once a defendant makes a statement, it can no longer be presumed that his silence is based on Miranda.

The government contends, in response to Morales's claim of a *Doyle* violation, that Morales's statement was inconsistent with his trial testimony that he was working undercover. We need not address the contention, however, as no objection was made to the references and they do not amount to plain error.

Pursuant to the plain error doctrine, we may notice serious defects in trial proceedings even though they were not brought to the trial court's attention. Rule 52(b), Fed. R.Crim.P. Even so, the Supreme Court has made it clear that the doctrine is not lightly to be applied:

> The plain-error doctrine of Federal Rule of Criminal Procedure 52(b) tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." Any unwarranted extension of this exacting definition of plain error would skew the Rule's "careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed."

*United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985) (citations and footnotes omitted).

We see no miscarriage of justice here. The evidence of Agent Tittle, if credited by the jury, was damning. Taken together with the taped conversation, it was such as to overwhelm Morales's unlikely story that he—essentially a process-server—had suddenly decided to constitute himself an undercover drug agent.

The same is true of Morales's claim that counsel was ineffective for failure to object to the comments on his silence and for presenting both a claim of innocence and an entrapment defense. Even assuming that these were professionally unreasonable errors, it remains necessary for reversal that there also be the probability of a different result resulting from them sufficient to undermine confidence in the trial's outcome. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). We think no such probability has been shown. Morales's tale that he had suddenly, without effectively coordinating with any other law enforcement officer or agency, determined to renounce his essentially house-keeping law-enforcement job and embark on an undercover enterprise trapping dope smugglers in company with his probationer friend all but defies belief to begin with. Ranged against the other record evidence, it might have served as the basis for a jury pardon; but little more can have been hoped for from it.

AFFIRMED.

JERRY E. SMITH, Circuit Judge, dissenting:

I respectfully dissent, and would reverse the conviction and remand for new trial.

The case turns on the brief conversation between defendant and the sheriff, at the point when defendant was arrested. The sheriff asked defendant, "What happened, Isidro?" Defendant replied, "I don't know why these men are bringing me here." He said nothing further. I would hold, contrary to the government's assertion, that defendant's comment either (i) was tantamount to silence, or (ii) was not inconsistent with his trial testimony. In either event, the prosecution's comment on the statement was plain error entitling defendant to a reversal under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

The statement could easily be deemed small-talk or casual conversation and hence

tantamount to silence. If defendant had merely commented on the weather, for example, or had said something inconsequential like, "Hey, how are you doing today, Sheriff?", surely we would not permit the prosecutor or the court to comment upon the fact that defendant did not also assert his innocence. In other words, it makes no sense that the test for whether a defendant is "silent" for purposes of *Doyle* and *Miranda* is whether the defendant utters any audible words. It would be illogical to prohibit comment, at trial, on a defendant's absolute silence but to allow comment where a defendant mouths a few fairly meaningless, possibly extraneous words but does not add to those words a protestation of innocence.

Probably the better view, though, of Morales's comment is that, rather than being tantamount to silence, it constitutes a statement that is *consistent* (or at the very least, *not inconsistent*) with his trial testimony that he was working undercover. Assume, in another context, a known law enforcement official who in fact is engaged in a coordinated undercover investigation. Suddenly, and unexpectedly, he is arrested by sheriff's deputies. He is taken to the sheriff, who says, "What happened, Joe?" He replies, "I don't know why these men are bringing me here." We would not necessarily expect such a person to proclaim his innocence on the spot or to permit the judge and prosecutor to be able to comment on his "silence" if he did not.

The majority does not reach the question of whether defendant's statement was inconsistent, since the majority concludes that there is no plain error. It suggests that the evidence of guilt was so overwhelming that there is no "probability of a different result," occasioned by the errors in the trial court, "sufficient to undermine confidence in the trial's outcome" (citing *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)).

Were I to view the evidence de novo, I likely would agree that defendant's story that he was engaged in undercover operations, in the majority's words, "all but defies belief." But the point is that apparently some of the jurors, infected with the comments of the prosecutor and the judge, did not think so.

During its deliberations, the jury sent a note stating (in less than perfect English) "Thet some of us can not a unanimous dissicion on this case. And I don't belive thet it will be possible for us. to do so." [Sic.] Although a unanimous verdict was later reached, it is evident from the jury's note that it had difficulty in reaching its decision. (Earlier, the jury additionally had asked to re-listen to tapes that had been introduced into evidence.) [1]

I cannot say with the ease of the majority that, under these circumstances, the prosecutor's and court's improper comments upon the defendant's exercise of his

---

1. The dynamics of the jury deliberations are further shown by affidavits of two jurors filed with the district court after sentence was pronounced. They read as follows:

1. My name is Anna Barrera and I am 21 years old. I served a juror [sic] in The U. S. District Court involving defendant Isidro Morales. At first, my feeling was that Mr. Morales was *not* guilty but after the judge ordered the jury back into deliberation I felt that we were being pressured by some of the jurors to reach a guilty verdict.
There was alot [sic] of tension in the jury room because most of the jurors had a long way to drive to go home and they wanted to reach a decision by 5:00 P.M. We reached a guilty verdict but we did not all agree.
2. My name is Angela F. Cantu and I served on a federal jury in Brownsville in a case

involving Isidro Morales, who was a defendant. I felt I was pressured into making a decision on the case before I was prepared to.. [sic] I felt sick about it afterwards. The other jurors said I couldn't be right but I still felt he was not guilty. I almost was angry because I thought what I had in my mind was right. When we can in with the verdict I still felt he was not guilty. I cried about what had happened. It was very painful to convict a man I thought was innocent.
The affidavits were attached to the defendant's motion for release pending appeal. Although they apparently were received by the trial judge without objection from the government, their admissibility is questionable under Fed.R.Evid. 606(b). But even without the affidavits, it is obvious from the record that the jury had difficulty arriving at a unanimous verdict.

right to silence were harmless. They might very well have tipped the scales in favor of conviction in this case that apparently was a close one in the eyes of the jury.[2]

Accordingly, I believe there was plain error. The defendant can easily be retried, without the subject prejudicial comments. If the evidence of guilt is as overwhelming as the majority asserts, he in all likelihood will be re-convicted. I respectfully dissent.

2. We may reasonably assume that the questions by the judge himself had a special impact upon the jurors. For example, the following colloquy occurred at trial:

BY MR. GUERRA [the prosecutor]:

Q. So at the time you got arrested, the Sheriff was there and you didn't say anything like, "Sheriff, there is a mistake," or anything like that?

A. No, because he didn't give me any chance. He just come over here and read me the rights.

THE COURT: But that's a friend of yours, right? I mean, you participated in elections in Brooks County, right?

THE WITNESS: Right.

THE COURT: And he has probably come to you and asked you for help in the past with regard to elections and things like that, right? Sir?

THE WITNESS: How is that?

THE COURT: He has probably come and asked you for your support with regards to elections and other things in the past, has he not?

THE WITNESS: Well, he never asked for voters.

THE COURT: But he has come in the past and talked to you about—

THE WITNESS: Oh, yes.

THE COURT:—either law enforcement or whatever, is that right?

THE WITNESS: Yes, come to my house and drink a coke or so.

THE COURT: And you couldn't feel you could just—what's his name?

THE WITNESS: Ramiro Castellano.

THE COURT: You couldn't say, "Ramiro, this is a terrible mistake here. I was doing undercover work myself and I was trying to arrest these people." You didn't feel comfortable enough to say that?

THE WITNESS: The reason I didn't ask him is because he just read the rights and left right away.

THE COURT: After he read the rights to you, he asked you whether you understood that? Isn't that one of the procedures when someone reads your right?

THE WITNESS: Yes.

THE COURT: And when you read somebody their rights, you say something to the effect: "You have the right to remain silent. Any answers to any questions you answer may be used against you in a court of law. You have a right to request an attorney. And you have a right to stop the questioning at any point." Those are the type of rights he read to you?

THE WITNESS: Yes.

THE COURT: He had to wait for you to respond to some of these, is that right? He had to wait for you to say yes when he asked you about your rights?

THE WITNESS: I don't know if I said yes or no, because the man was in a hurry. He just grabbed me by the arm and put me in the car.

THE COURT: There was some time there, was there not, where you could have said something, is that correct?

THE WITNESS: Well, maybe.