[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11375
Non-Argument Calendar
_____

D.C. Docket No. 0:17-cv-62323-WPD

OLIVER THOMAS,

Petitioner – Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondent – Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 9, 2019)

Before JORDAN, BRANCH, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Oliver Thomas appeals *pro se* the district court's denial of his 28 U.S.C. § 2254 habeas petition. He contends that the prosecutor's repeated references at trial to his failure to explain how his fingerprints were found at the murder scene violated his Fifth, Sixth, and Fourteenth Amendment rights. Because the state court did not unreasonably apply clearly established federal law in denying Mr. Thomas' claim, we affirm.

**I**

Mr. Thomas was convicted and sentenced to life in prison for armed robbery and first-degree murder. At the crime scene—a gas station—the police discovered an unopened pack of Newport cigarettes under the cash register. A later fingerprint analysis revealed that the pack bore Mr. Thomas' little finger and index fingerprints. When Mr. Thomas was brought in for questioning, an officer asked him—after reading him his rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966)—whether he could explain the fingerprints.[1]

---

[1] One of the officers testified that he informed Mr. Thomas of his right to remain silent and his right to an attorney, and that Mr. Thomas chose to voluntarily speak to the police. Mr. Thomas did not object to this recounting of his interview with the officers, and the trial court appeared to agree that Mr. Thomas waived his *Miranda* rights by choosing to speak. *See* D.E. 13-1 at 1368 ("In this case the defendant gave statements, he gave statements to the police not once but a few times after *Miranda* was invoked, after the defendant was advise[d] of *Miranda*.").

At this point, Mr. Thomas' version and the officer's version of the events diverge. There is no definitive account of the interview because the officer did not record it.

The officer testified that, after some casual conversation, he told Mr. Thomas that the police had found his fingerprints at the scene of the crime, and Mr. Thomas then "started getting undressed." D.E. 13-1 at 1149. When the officer played a tape of the suspected getaway driver identifying Mr. Thomas as the armed robber, Mr. Thomas claimed that the driver was lying. *Id.* at 1149–50. The officer then asked him to explain how the police found his fingerprints at the crime scene. According to the officer's testimony, Mr. Thomas "couldn't explain . . . how his fingerprints were on the cigarettes." *Id.* at 1152.

In his testimony at trial, Mr. Thomas explained that he removed his clothes at the interview to show the officer that he "was the victim of a shooting" that occurred days before the robbery. *Id.* at 1352–53. During cross-examination, the prosecutor asked Mr. Thomas "how is it that your fingerprints got on a pack of cigarettes left underneath the cash drawer after a robbery/murder took place?" *Id.* at 1363. Mr. Thomas responded that he didn't "have the slightest idea" but thought that it might be because he had bought some cigarettes before meeting his girlfriend at a club, and the clerk gave him the wrong box. *Id.* at 1363–64. "[H]e gave me a short pack," Mr. Thomas testified. "I asked him for a long pack, and I gave him the short pack

3

back, he gave me the long pack, and I left." *Id.* at 1364. The prosecutor then asked why this account differed from a letter the police found between Mr. Thomas and the getaway driver, in which Mr. Thomas alleged that the "police planted the cigarettes on the counter." *Id.* at 1370. Mr. Thomas responded that he wrote the letters to convince the getaway driver to confess that he had lied to the police—he was only assuming that the cigarettes were planted. *Id.* at 1375.

The prosecution also raised what it characterized as Mr. Thomas' failure to explain the fingerprints in both its opening statement and closing argument. During the state's opening statement, the prosecutor said that Mr. Thomas "has no explanation for why his fingerprint could possibly be on a pack of cigarettes on a counter under the cash drawer." D.E. 13-1 at 569. During Mr. Thomas' closing argument, his attorney said: "The State put on testimony, okay, that those fingerprints appear to be Oliver Thomas. Oliver Thomas is left trying to figure out how his fingerprints ended up on a pack of Newport cigarettes, and he's coming up with lots of different hypotheses. . . . The difference is we can give you our hypotheses about how it's possible but we have nothing to prove." *Id.* at 1453. On rebuttal, the prosecutor stated that the defense "basically glossed over, gee, we can't explain to you why his prints are on that pack of cigarettes." *Id.* at 1492.

The defense repeatedly objected to the prosecutor's and the officer's statements, arguing that they (1) amounted to impermissible commentary on Mr.

Thomas' constitutionally protected silence, and (2) constituted impermissible burden shifting. *Id.* at 570, 1492. The prosecution responded by arguing that Mr. Thomas in fact made an affirmative statement instead of staying silent, because he "specifically sa[id] he could not explain it, he had no explanation." *Id.* at 571.

The trial court overruled Mr. Thomas' objections. After, the jury found Mr. Thomas guilty, and the trial court sentenced him to life in prison. Mr. Thomas repeated his arguments on appeal to the Florida Fourth District Court of Appeal, which affirmed his conviction in a one-word opinion. He pursued the same issues in state post-conviction motions and was again denied relief.

Mr. Thomas then filed a § 2254 habeas petition that, among other claims, repeated his constitutional objections to the prosecutor's statements about his lack of an explanation for the fingerprints. The district court denied his petition because "the objected to comments and testimony were more about the absence of evidence, rather than a comment on [Mr.] Thomas's silence." D.E. 16 at 4. Thus, it was not an unreasonable application of federal law for the Florida courts to find the "questions were proper impeachment . . . not a comment on what was not said." *Id.* at 5.

Mr. Thomas sought a certificate of appealability, which the district court granted on one issue: "Whether the prosecutor's repeated references to [Mr.]

5

Thomas' lack of an explanation for his fingerprints being on the cigarette pack was improper and, if so, whether harmless error applies?" D.E. 17 at 1.

## II

We review *de novo* a district court's denial of a § 2254 petition. *See Reed v. Sec'y, Fla Dep't of Corr.*, 593 F.3d 1217, 1239 (11th Cir. 2010). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), however, we may only grant habeas relief when claims adjudicated on the merits in state court are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For a state-court decision to be an "unreasonable application" of Supreme Court precedent, it must be more than incorrect—it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 53, 75 (2003). The state prisoner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Mr. Thomas asserts that the Florida courts violated his clearly established right to remain silent by permitting the prosecution to comment on his failure to explain how his fingerprints were found on the pack of cigarettes at the crime scene. By allowing these statements, he argues, the trial court also impermissibly shifted

the burden the proof to him to come forward with an explanation for the fingerprints and proof of his innocence.

In *Doyle v. Ohio*, 426 U.S. 610 (1976), "the Supreme Court held that the use of a defendant's silence at the time of his arrest for impeachment purposes violates due process because warnings pursuant to *Miranda* . . . carry an implicit assurance that silence will carry no penalty." *United States v. Reeves*, 742 F.3d 487, 504 (11th Cir. 2014). "[B]ut a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, that defendant has not remained silent at all." *Anderson v. Charles*, 447 U.S. 404, 408 (1980). *See also Lofton v. Wainwright*, 620 F.2d 74, 78 (5th Cir. 1980) (holding that once a defendant "chooses to contradict his post-arrest statements to the police . . . it becomes proper for the prosecutor to challenge him with those statements").

Here, the Florida courts reasonably determined that Mr. Thomas' post-*Miranda* statement concerning the fingerprints was not covered by *Doyle*. Rather than staying silent when the police officers confronted him with the fingerprint evidence found at the crime scene, Mr. Thomas expressly stated that he did not know how his fingerprints were there. At trial, he then attempted to contradict those statements by explaining that he previously bought cigarettes at the store. As far as we can tell, there is no established federal law that forecloses the prosecution from

using Mr. Thomas' own inconsistent statements to impeach his trial testimony after he chose to testify. *Cf. Routly v. Singletary*, 33 F.3d 1279, 1290–91 (11th Cir. 1994) (adopting the district court's order: where the defendant chose to testify, the prosecutor's references to his right to take the stand did not violate his right to remain silent, absent evidence that the defendant incriminated himself during his testimony).

Nor did the prosecution shift the burden of proof to Mr. Thomas by referring to his post-*Miranda* statement.   Mr. Thomas argues that, as a result of the prosecution's impermissible use of his statements about his fingerprints, he was left with "no choice but to testify in order to give a reasonable hypothesis as to why his fingerprints were left at a contaminated crime scene." Appellant's Br. at 15.  This forced him to "become a witness against himself violating his Fifth Amendment right." *Id.* at 17.  But once Mr. Thomas voluntarily chose to make a statement to the police after being *Mirandized*, he opened himself to the possibility that those same statements could be used against him at trial. *See Harris v. New York*, 401 U.S. 222, 225–26 (1971).  *See also United States v. Dodd*, 111 F.3d 867, 869–70 (11th Cir. 1997) (holding that the prosecution's reference to the defendant's custodial statements were permissible because "[t]he prosecutor's comments here can reasonably be read to refer to the inconsistency between [the defendant's] defense and his post-*Miranda* statement").

8

## III

For the foregoing reasons, we affirm the district court's denial of Mr. Thomas'

§ 2254 petition.

**AFFIRMED.**