2 F.3d 1157
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Philip K. SADOWSKI, Petitioner-Appellant,
v.
Jack McCORMICK, Warden, Montana State Prison, Respondent-Appellee.
 No. 92-35359.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 3, 1993.
Decided July 8, 1993.
 
 Before WRIGHT, ALARCON and BEEZER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Philip K. Sadowski, a Montana state prisoner, appeals from the denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. Sec. 2254. He contends that he is entitled to a new trial because he was deprived of his right to due process as a result of prosecutorial misconduct, the admission of evidence of a prior bad act, and the failure of the investigating officers to preserve evidence that may have supported his theory of self defense. We review de novo the denial of a petition for habeas corpus. Torrey v. Estelle, 842 F.2d 234, 235 (9th Cir.1988). We affirm because we conclude that the record does not demonstrate that Sadowski's conviction was obtained in violation of his right to due process.
 
 I.
 PERTINENT FACTS AND PROCEDURAL HISTORY
 
 3
 At the state trial on the issue of guilt, prosecution witness Frank McKinnis testified that he met Sadowski and his cousin, Sid Warburton, at a tavern located in Gallatin County, Montana. McKinnis was with a woman named Lynn Bell. McKinnis and Sadowski discussed woodworking. Sadowski told McKinnis he owned the Furniture Doctor, a furniture restoration and repair business. It was located in a shop next to Sadowski's home. While at the bar, McKinnis was introduced to Robert Hare. Bell stated Hare was a friend. When the bar closed, Sadowski invited McKinnis and Bell to his shop to continue drinking and to show off his woodworking tools.
 
 
 4
 As McKinnis and Bell were leaving the bar, they met Hare. Hare was invited to spend the night at McKinnis' residence. Hare, McKinnis, and Bell followed Sadowski to his shop. When they arrived, Sadowski told Hare, McKinnis, Bell, and Warburton to wait outside until he locked up his dogs. Bell introduced Hare to Sadowski as a friend. Sadowski invited him into his shop with the others.
 
 
 5
 The group drank alcohol and everyone became intoxicated. At approximately 3:30 a.m., Sadowski escorted McKinnis outside to show him his wood supply. When Sadowski and McKinnis reentered, Warburton was standing next to Hare and Bell near the doorway to the tool room. Warburton said, "He had hurt me. He'd hurt me." Sadowski told Warburton to "knock it off."
 
 
 6
 McKinnis testified that Sadowski permitted him to use his tools and equipment. While he worked on the bandsaw, McKinnis had his back to the other persons in the shop. Prior to finishing his use of the bandsaw, McKinnis asked Bell to get him a beer.
 
 
 7
 When McKinnis finished working on the bandsaw, he turned around and observed Hare standing near the entrance to the shop, about 10 to 12 feet away from Sadowski. McKinnis testified the two men were speaking in low tones. Hare was gesturing with his hands in front of him as he spoke. McKinnis did not see anything in Hare's hands. No one else was in the shop. As McKinnis walked towards them, Sadowski said: "I'm tired of all this bullshit." Sadowski then turned to the counter, turned around, pointed his revolver at Hare, and fired it. Hare then stated: "I've been shot." He grasped his chest and fell to the floor. Sadowski pointed the revolver at McKinnis. McKinnis told him that "if he was going to shoot me, do a good job of it or call the police."
 
 
 8
 Sadowski lowered the revolver. McKinnis placed Hare's body in the proper position for the administration of CPR. When McKinnis became aware that Hare was dead, he closed Hare's eyes. Thereafter, McKinnis ran outside to direct the police to Hare's body.
 
 
 9
 Sadowski's version of these events surrounding the homicide differs significantly. The jury credited McKinnis' testimony.
 
 
 10
 Sadowski testified that when Warburton first yelled "[t]hey are hurting me," he thought it was odd, but did nothing about it. Later, according to Sadowski's version of the facts, McKinnis asked him to get some beer from inside the house. While Sadowski was in his living quarters, he heard Warburton cry out that he was being hurt. Sadowski testified that he became concerned that these strangers were about to commit a robbery or some other untoward act. He was aware that Warburton was extremely intoxicated and was wearing quite a bit of jewelry. To protect himself from assault, Sadowski placed a revolver in his belt in the back of his pants and returned to the shop. When Sadowski asked Warburton what was going on, he answered incoherently. Bell replied: "Oh, there's not really any problem. Everything's okay. There's no problem." Sadowski saw Warburton and Bell kissing. They walked out of the shop toward his apartment.
 
 
 11
 Sadowski testified that McKinnis had his back to Bell and Warburton, and did not observe their conduct as he worked at the bandsaw. Sadowski asked Hare, "What's going on out there?"
 
 
 12
 According to Sadowski, Hare replied: "Well, you know what's going on out there. She's sort of jerking him around and this is how we get our power." Sadowski asked Hare to explain what he meant. Hare replied: "Well, that's just what we do." Sadowski testified that he became frightened because he thought the visitors were planning a robbery or were part of a cult. Sadowski stated that he stepped back a couple of steps and pulled out the revolver and placed it in front of him without pointing it and stated: "Look, I don't know what the hell's going on at this point but I want you to--" At this point, Hare advanced towards him yelling, "[o]h, you can't stop me with that."
 
 
 13
 Sadowski testified he continued to retreat and again asked Hare not to come any closer. Hare continued advancing towards him yelling, "[y]ou can't stop me." Hare then crouched, brought his right hand up, placed his left hand in front of him, and appeared ready to launch himself at Sadowski. When his back touched the wall, Sadowski brought the gun up, aimed at Hare's chest, and shot him.
 
 
 14
 Sadowski testified that Hare had been standing next to a table that contained many tools that could serve as a weapon just prior to the homicide.
 
 Sadowski's First Pre-Arrest Statement
 
 15
 Sadowski testified that he laid the gun on the chair and called the Gallatin County Sheriff's Office. His telephone call was recorded. Sadowski told the dispatcher "Um, a person in my house has been shot, I shot him." Sadowski also stated: "It happened while he was getting right in my face." Sadowski did not tell the dispatcher that he believed that Hare was armed. The dispatcher asked Sadowski: "Was he robbing you or what?" Sadowski replied: "Ah, no he, ah I can't explain the situation." The dispatcher then inquired: "Was it a fight?" Sadowski answered: "It's it's complicated." Later Sadowski stated to the dispatcher: "The man was being totally aggressive, he was aggressive as I said earlier.... You do what you have to do to protect yourselves."
 
 Sadowski's Second Pre-Arrest Statement
 
 16
 When the sheriff's deputies arrived at Sadowski's shop in response to his call, Sadowski told Sheriff Charles Cutting and Deputy Sheriff William Rash that he shot Hare and had called the Sheriff's Department. Deputy Rash then arrested Sadowski and advised him of his Miranda rights. He was not questioned in the shop by any of the officers. Instead, he was placed in Montana Highway Patrolman Bryan Adams' custody for transportation to the Law and Justice Center in Bozeman, Montana, at approximately 4:27 a.m. The record is silent as to how many minutes Sadowski remained in the shop after he was advised of his constitutional rights. During the time period between Deputy Rash's arrival at the shop and the transportation of Sadowski to the Law and Justice Center, the only statement heard by Deputy Rash was, "I shot him."
 
 Sadowski's First Post-Arrest Statement
 
 17
 Sadowski did not make any statement to Patrolman Adams as they drove to the Law and Justice Center. After they arrived, Sadowski spoke to Patrolman Adams about the homicide although Patrolman Adams had not questioned him. Adams testified that Sadowski stated that Hare "came at him with a knife and that he had no choice but to shoot ... shoot to kill."
 
 Sadowski's Second Post-Arrest Statement
 
 18
 Cutting advised Sadowski again of his constitutional rights at 5:05 a.m. Sadowski told Cutting that he wanted to talk and Cutting recorded these statements. Sadowski told Sheriff Cutting that after he drew his revolver, Hare said "no you can't stop me with that." Hare then "reached around and reached out with his right hand and had something in his right hand that was shiny." Sadowski stated that he thought Hare had a knife.
 
 II.
 
 19
 ALLEGED IMPEACHMENT BASED ON POST-ARREST SILENCE
 
 
 20
 Sadowski first argues that the prosecutor questioned Sadowski and other witnesses about his silence after he was admonished concerning his Miranda rights. Sadowski also contends that the prosecutor argued to the jury that Sadowski's silence after he was advised of his constitutional rights constituted evidence of guilt. He contends that the prosecutor's tactics violated his right to due process as explicated in Doyle v. Ohio, 426 U.S. 610 (1976). We discuss these contentions and the pertinent portions of the record under separate headings.
 
 
 21
 A. The Prosecutor's Questions were Limited to Sadowski's Pre-Arrest Statements
 
 
 22
 In Doyle v. Ohio, the Supreme Court instructed that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618. The Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Id. at 619.
 
 
 23
 In Doyle, the petitioners were arrested for selling marijuana. They were advised of their constitutional rights. Each petitioner remained silent. At trial each petitioner testified that a police informer had framed him. Id. at 611-13. During cross-examination, over objection, the prosecutor inquired of each petitioner whether he had told the police he had been framed. Id. at 613-14. Here, in contrast, the prosecutor impeached Sadowski with his pre-arrest statement.
 
 
 24
 The following colloquy took place during the prosecutor's cross-examination of Sadowski:
 
 
 25
 Q. Now, there at the building, at the shop when they were there, you made the statement that, "I shot him," right?
 
 
 26
 A. Yes.
 
 
 27
 Q. What were the officers doing while you were there? Did you see them?
 
 
 28
 A. There were a bunch of people. There were a bunch of people doing all kinds of things.
 
 
 29
 Q. Did you ever say to anybody, "That man had a knife in his hand and it's over there, look for it"?
 
 
 30
 A. No, I didn't.
 
 
 31
 Q. Why not?
 
 
 32
 A. It didn't occur to me.
 
 
 33
 Q. It occurred to you that you had shot him, but not that he had a knife in his hand; is that right?
 
 
 34
 A. No, I didn't see--It didn't occur to me "He had a knife in his hand." It didn't occur they would look for it--I would assume they would do that.
 
 
 35
 (emphasis added).
 
 
 36
 This cross-examination did not violate Doyle. The prosecutor made no reference to Sadowski's post-arrest silence. His questions expressly referred only to the omission of facts in Sadowski's pre-arrest statement at the shop.
 
 
 37
 The following exchange occurred in a later portion of this same cross-examination:
 
 
 38
 Q. In fact the first time that you mentioned anything about a knife, or something was some silver thing, was in this building when you were talking to Bryan Adams downstairs, right?
 
 
 39
 A. I'm not sure of that.
 
 
 40
 Q. Well, did you ever tell anybody before that?
 
 
 41
 A. I don't think so.
 
 
 42
 Q. Why did it occur to you that you should tell him when you were on the second floor down here?
 
 
 43
 A. I'm not sure. I don't remember the circumstances.
 
 
 44
 Q. You don't remember telling him that?
 
 
 45
 A. No, I don't remember the circumstances of why it came up.
 
 
 46
 Q. Do you remember talking to him?
 
 
 47
 A. Yes.
 
 
 48
 Q. The truth is that you told Bryan Adams that because you knew that you were in a whole lot of trouble and you had better put a weapon in Rob Hare's hands; is that right?
 
 
 49
 A. No, that's not right.
 
 
 50
 Sadowski's voluntary statement to Patrolman Adams was made without any attempt at interrogation by the transportation officer. Sadowski had been fully advised of his constitutional rights after his arrest. The Miranda rule does not prohibit the introduction of statements volunteered to the police. See Miranda v. Arizona, 384 U.S. 436, 478 (1965) ("Volunteered statements of any kind are not barred by the Fifth Amendment...."). Furthermore, an arrested person who has been previously admonished regarding his constitutional rights may waive his right to remain silent by speaking voluntarily to a second officer who has not repeated the Miranda warnings. See Maguire v. United States, 396 F.2d 327, 331 (9th Cir.1968) (second Miranda warning by police officer unnecessary where different officer gave Miranda warning to defendant three days earlier), cert. denied, 393 U.S. 1099 (1969). The record does not support Sadowski's claim that he was impeached during cross-examination by his post-arrest silence.
 
 
 51
 Sadowski's trial counsel asked Deputy Rash on cross-examination: "Phil Sadowski, the entire time you were there, never denied he did the shooting, did he?" (emphasis added). Deputy Rash replied: No sir, not that I can recall."
 
 
 52
 On redirect examination, the prosecutor questioned Deputy Rash about Sadowski's statements during the same time period as follows:
 
 
 53
 Q. Deputy Rash, from the time that you arrived at the building until the Defendant was taken away from the building, how much time elapsed? Can you tell me?
 
 
 54
 A. I would say I arrived [at] 4:07 a.m., and Lieutenant Pronovost arrived at 4:29 a.m., possibly 20 minutes.
 
 
 55
 Q. Now during that time, other than saying, "I shot him," did the Defendant say anything else?
 
 
 56
 A. Not that I heard.
 
 
 57
 Sadowski maintains that these questions violated Doyle because the prosecutor used Sadowski's post-arrest silence to impeach his exculpatory testimony at trial. As noted above, Deputy Rash testified that he transferred custody of Sadowski to Patrolman Adams for transportation to jail without questioning the prisoner after advising him of his constitutional rights. Sadowski has not demonstrated from this record that he remained at the shop for any appreciable time after he was advised of his constitutional rights. Thus, it is not clear that he remained silent at the place of his arrest after being advised of his Miranda rights. It should be noted that the murkiness of the record on this point is due in part to the absence of any objection by Sadowski's trial counsel to any of the alleged Doyle violations.
 
 
 58
 Assuming arguendo that the redirect examination of Deputy Rash referred to Sadowski's silence between the time he was admonished concerning his constitutional rights until the officers removed him, we hold no Doyle error occurred. The defense "opened the door" for the prosecutor to question Rash concerning whether Sadowski had denied shooting Hare while the parties were at the crime scene. See Bradford v. Stone, 594 F.2d 1294, 1296 (9th Cir.1979) (per curiam) (defense counsel opened door by dwelling on defendant's post-arrest silence).
 
 
 59
 Sadowski also contends that the prosecutor committed Doyle error during his direct examination of Patrolman Adams. He complains specifically about the following questions and answers:
 
 
 60
 Q. Did anything occur from the Furniture Doctor building when you transported [Sadowski] to the Law and Justice Center here? Did anything occur in your car?
 
 
 61
 A. No.
 
 
 62
 Q. Did the defendant say anything to you?
 
 
 63
 A. While in the vehicle?
 
 
 64
 Q. Yes.
 
 
 65
 A. Not that I recall, no, he did not.
 
 
 66
 The record also discloses, however, that this inquiry was immediately followed by a series of questions to lay a foundation for admission of the statement Sadowski volunteered to Patrolman Adams. The balance of the same page of the reporter's transcript reads as follows:
 
 
 67
 Q. How did he appear?
 
 
 68
 A. He appeared--his eyes were very bloodshot and watery. There was a very strong odor of an alcoholic beverage about him on his breath. He did smell of alcohol quite a bit. He didn't stagger really bad, but he appeared to be intoxicated from my observation.
 
 
 69
 Q. Now, when you--how long did you wait downstairs on the second floor?
 
 
 70
 A. It was right around five to ten minutes.
 
 
 71
 Q. And while you were waiting, did you have any conversation with him?
 
 
 72
 A. Yes, there was a conversation that did take place.
 
 
 73
 Q. Did you ask him any questions?
 
 
 74
 A. No, I did not.
 
 
 75
 Q. Did he say anything to you?
 
 
 76
 A. Yes, he did.
 
 
 77
 To constitute a violation of Doyle, the record must show that the prosecution was attempting to draw meaning from silence. See United States v. Ochoa-Sanchez, 676 F.2d 1283, 1287 (9th Cir.) (no Doyle error where prosecutor's questions did not attempt to draw meaning from silence), cert. denied, 459 U.S. 911 (1982). Sadowski has not demonstrated that the questions concerning Sadowski's silence in the car just prior to his volunteering an exculpatory statement was intended to draw an inference of guilt from silence. It is more reasonable to infer that the prosecutor was merely setting forth the historical facts that immediately preceded Sadowski's volunteered, self-serving statement to an officer who had not asked him any questions.
 
 
 78
 B. Prosecutorial Comment on the Omission of Details in Sadowski's Statement to the Officers
 
 
 79
 Sadowski argues that the prosecutor "commented to the jury on Mr. Sadowski's silence after he received his Miranda warnings, and suggested that Mr. Sadowski's post-Miranda silence constituted evidence that Mr. Sadowski's testimony about self-defense was a fabrication." Sadowski relies on two portions of the prosecutor's argument in support of this argument. In his opening argument, the prosecutor stated:
 
 
 80
 You'll remember how Officer Adams characterized the defendant when he said he was looking down the hall and then he turned and looked at Officer Adams and said 'shoot to kill.' That's the first time anybody heard about Rob Hare having any kind of weapon.
 
 
 81
 The prosecutor did not refer expressly to Sadowski's post-arrest silence. We are required to draw every inference from the record that upholds the judgment. Payne v. Borg, 982 F.2d 335, 338 (9th Cir.1993). Thus, we infer that the prosecutor referred to Sadowski's failure to mention that Hare held a shiny object when he made his voluntary pre-arrest statement. The defendant's failure to object at trial shows that he did not believe the prosecutor had committed misconduct in pointing to these omitted facts which an innocent person would have revealed immediately to avoid arrest and prosecution. The jury was free to determine from this omission that Sadowski fabricated these self-serving statements to avoid conviction for the deliberate homicide.
 
 
 82
 Sadowski also asserts that the following statement in the prosecutor's closing argument violated the Doyle rule.
 
 
 83
 The knife was fabricated. The shiny object was fabricated in this building on the second floor down here....
 
 
 84
 ....
 
 
 85
 The only weapon, ladies and gentlemen, in this case is this weapon right here (indicating [Sadowski's revolver]. There is no other weapon. There never was any other weapon, and a reasonable person does not make up a story about a weapon. He had every opportunity out there when the Sheriff's deputies arrived to talk about the weapon. What happened here? "I shot him." What would a reasonable person do? I shot him because he had a shiny object; he had a knife. He was attacking me. I shot him." He's trying to make you believe that he had all of his wits about him, and that he was acting totally reasonable.
 
 
 86
 (emphasis added).
 
 
 87
 The prosecutor's comments refer solely to the omission of exculpatory facts in Sadowski's voluntary statements. Doyle does not bar comment regarding statements made by an accused prior to his arrest.
 
 
 88
 The record does not support Sadowski's claims that the prosecutor suggested to the jury that it could consider Sadowski's silence after he was advised of his constitutional rights in weighing the credibility of his testimony at trial. The omission of exculpatory facts occurred during voluntary statements made by Sadowski before he was arrested or accused of any crime.
 
 III.
 EVIDENCE OF PRIOR ACTS
 
 89
 Over objection, the state court admitted evidence of a prior bad act. The court stated the evidence was admissible to prove "intent, opportunity, knowledge, absence of mistake or accident." Sadowski was charged with deliberate homicide.
 
 
 90
 To support its theory that Sadowski armed himself and shot Hare without adequate provocation or threat of physical harm, the prosecutor presented the following evidence: Sheriff's Deputy Robert Campbell testified that on August 4, 1986, two years and eight months before the homicide date, Sadowski telephoned the Sheriff's office to report that he was going to shoot himself. In response to Sadowski's telephone call, Deputy Campbell went to Sadowski's residence. Sadowski told Deputy Campbell that he was distraught because his marriage was about to break up. Deputy Campbell talked to Sadowski for two and one-half hours at which time Sadowski's wife came home.
 
 
 91
 While Deputy Campbell spoke to Mrs. Sadowski, Sadowski got up from the couch and pointed a gun at Deputy Campbell. Sadowski stated that he, and not the officer, was now in control of the situation. Deputy Campbell ducked behind a book case and crawled backwards out of the house. Once outside, Deputy Campbell looked through a window and saw Sadowski point the gun at his own head. He then gave the gun to his wife. Mrs. Sadowski gave the gun to Deputy Campbell. Sadowski was placed in protective custody but was not charged with a crime for pointing a gun at Deputy Campbell.
 
 
 92
 Sadowski asserts that the prior act evidence was inadmissible because "[t]he state's obvious purpose of presenting testimony that Phil Sadowski had pointed a gun at a police officer was to attempt to show that he was a dangerous criminal." Sadowski also appears to argue that the evidence was not admissible to prove knowledge and intent because "Phil Sadowski acknowledged that he purposefully or knowingly caused the death of Robert Hare, thereby making proof of intent, knowledge, and absence of mistake or accident, irrelevant."
 
 
 93
 Sadowski ignores that fact that the prosecution had to show beyond a reasonable doubt that he intended to kill Hare. In re Winship, 397 U.S. 358, 364 (1970). Sadowski has not demonstrated that he offered to stipulate that the homicide was committed "purposely or knowingly" as required under Montana law. Mont.Code Ann. Sec. 45-5-102.[1] Absent a stipulation, a prosecutor must prove each element of the crime of deliberate homicide beyond a reasonable doubt. Cf. United States v. Houston, 547 F.2d 104, 107 (9th Cir.1976) (per curiam) ("When parties have entered into stipulations as to material facts, those facts will be deemed to have been conclusively established."); United States v. Mohel, 604 F.2d 748, 753 (2nd Cir.1979) ("stipulation [as to intent and knowledge] serves to remove intent and knowledge as issues in the case"). It would have been foolhardy for the prosecution to rely on Sadowski to establish an essential element of the crime charged against him.
 
 
 94
 Ordinarily, we do not review alleged errors of state evidence law. Jammal v. Van De Kamp, 926 F.2d 918, 919 (9th Cir.1991). We are required to review a state prisoner's challenge to the admission of evidence of prior bad acts if the petitioner makes a proper showing that he was denied his right to a fair trial under the Fourteenth Amendment. Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990). Assuming that the petitioner demonstrates that the admission of evidence violated due process, we must determine whether the alleged error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " Brecht v. Abrahamson, No. 91-7358, 1993 WL 119795, at * 3 (April 21, 1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).
 
 
 95
 We need not decide whether the prior acts were relevant to prove knowledge and intent because we have concluded, after reviewing the entire record, that the admission of this evidence did not have a substantial and injurious effect or influence in determining the jury's verdict in this case. The state court admonished the jury that the evidence of prior acts was offered for the limited purpose of showing "proof of opportunity, intent, absence of mistake or accident in this case." The court instructed the jury that the jury was "not to use this evidence of past acts for any other purpose." The jury was also told that the "evidence was not admitted to prove the character of the defendant in order to show he acted in conformity therewith." The record does not support an inference that the jury failed to follow this instruction.
 
 
 96
 Contrary to Sadowski's contention, the past act evidence introduced by the prosecutor did not demonstrate that Sadowski was a "dangerous criminal." Instead, it shows that, after pointing a gun at a law enforcement officer, Sadowski peacefully surrendered the weapon to his wife without firing it at anyone. If anything, this evidence would appear to undercut the prosecution's theory that Sadowski intentionally shot Hare without adequate provocation.
 
 
 97
 Finally, as conceded by Sadowski, once he testified that he shot Hare with the intent to kill him, the only factual issue that remained for the jury to decide is whether Sadowski acted in self defense. The question regarding his intent to kill was no longer in issue. We are persuaded that evidence that on another occasion, Sadowski pointed a weapon at a law enforcement officer prior to surrendering the weapon voluntarily, without firing it, did not substantially effect the outcome of this case.
 
 IV.
 
 98
 VIOLATION OF DUE PROCESS FOR ALLEGED FAILURE TO COLLECT
 
 EXCULPATORY EVIDENCE
 
 99
 Sadowski asserts that his right to due process was violated by the failure of the investigating officers to fingerprint and preserve all sharp, potentially lethal, or shiny objects after being placed on notice by Sadowski's post-arrest statement that he claimed that he acted in self defense. This contention lacks merit because Sadowski has failed to demonstrate that the officers acted in bad faith in failing to remove and fingerprint two screw drivers, a pair of pliers, and a tool in a can that was on a chair six or seven feet from the victim's body.
 
 
 100
 "[A] bad faith failure to collect potentially exculpatory evidence ... violate[s] the due process clause." Miller v. Vasquez, 868 F.2d 1116, 1120 (9th Cir.1989). Absent bad faith, there is no due process violation. Id. "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." United States v. Cooper, 983 F.2d 928, 931 (9th Cir.1993).
 
 
 101
 In the case at bar, the investigating officers searched the area around Hare's body for weapons. The officers found a chisel on a lathe 10 to 15 feet from Hare's body. Dust covered the chisel. Dust outlined the chisel on the lathe. Detective Christie, one of the officers at the scene, testified that the officers decided not to analyze the chisel for fingerprints because it appeared that it had not been used for some time. A set of keys was also found two or three feet from the body on a table. Detective Christie explained that no test was conducted for fingerprints because keys rarely produce usable prints. Detective Christie's testimony regarding the reasons for not preserving additional physical evidence was uncontradicted.
 
 
 102
 Sadowski did not produce any evidence that Hare, or any other person, placed a shiny object on the chair six or seven feet away from the place where the victim's body was found after the victim had received a fatal wound in the chest.
 
 
 103
 Finally, Sadowski claims that a showing of police bad faith is unnecessary in this matter because "[t]his case ... differs sharply from Arizona v. Youngblood, where 'the State did not attempt to make use of the materials in its own case in chief.' " Appellant's Brief at 48 (quoting Arizona v. Youngblood, 488 U.S. 51, 56 (1988)). The prosecution did not introduce evidence concerning the tools found in the shop in its case in chief. Sadowski has failed to show that the officers made "a conscious effort to suppress exculpatory evidence." California v. Trombetta, 467 U.S. 479, 488 (1984).
 
 
 104
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The statute reads in pertinent part:
 (1) A person commits the offense of deliberate homicide if:
 (a) he purposely or knowingly causes the death of another human being; or
 (b) he attempts to commit, commits, or is legally accountable for the attempt or commission of robbery, sexual intercourse without consent, arson, burglary, assault, or any other forcible felony and in the course of the forcible felony or flight thereafter, he or any person legally accountable for the crime causes the death of another human being.
 Mont.Code Ann. Sec. 45-5-102. Proof of intent is required unless the homicide is committed in the course of one of the enumerated felonies. The State never contended that Hare was shot in the course of a felony. Therefore, the prosecutor was required to prove intent.